PREBENSEN & BLAKSTAD, Libelant,

v.

BOARD OF COMMISSIONERS OF the PORT OF NEW ORLEANS and T. Smith & Son, Inc., Respondents.

No. 6725.

United States District Court
E. D. Louisiana,
New Orleans Division.

May 20, 1965.

Terriberry, Rault, Carroll, Yancey & Farrell, M. D. Yager, New Orleans, La., for libelant.

Phelps, Dunbar, Marks, Claverie & Sims, Harry S. Redmon, Jr., New Orleans, La., for Board of Com'rs of Port of New Orleans.

Lemle & Kelleher, Thomas W. Thorne, Jr., New Orleans, La., for T. Smith & Son, Inc.

AINSWORTH, District Judge:

Presented for decision in this case is the applicability of the sovereign immunity provisions of the Eleventh Amendment to the Federal Constitution, in regard to the Board of Commissioners of the Port of New Orleans, an agency of the State of Louisiana.

Libelant, Prebensen & Blakstad, as owner of the Norwegian SS FOLKE BERNADOTTE has alleged (and for the purposes of this motion it is taken as true [1]) that the vessel was damaged by respondent's negligent operation of certain machinery while cargo was being discharged at respondent's Bulk Handling Facility in the Port of New Orleans. Recovery is claimed in personam in both tort and contract.

Respondent, Board of Commissioners of the Port of New Orleans, has filed motions to dismiss for lack of jurisdiction, claiming sovereign immunity as a State agency. The Eleventh Amendment to the Federal Constitution provides that:

"The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

We must decide whether an action against the Dock Board would constitute an action against a state within the meaning of the Eleventh Amendment. Helpful to our decision is an inquiry into the decisions of Louisiana appellate courts which have involved the defense of sovereign immunity in suits against the Board.

First: Is the Board immune from tort actions? That this question must be answered in the affirmative is well supported by the decisions of the Louisiana courts. The Board has never been successfully subjected to an action in tort. Fouchaux v. Board of Com'rs, La.App. (Orleans), 186 So. 103 (1939), affirmed 193 La. 182, 190 So. 373 (1939), cert. den. 308 U.S. 554, 60 S.Ct. 112, 84 L.Ed. 466 (1939); Miller, Royal Indemnity Co., Intervener v. Board of Com'rs, 199 La. 1071, 7 So.2d 355 (1942), Fouchaux involved a tort claim against the Board by an employee of the International Harvester Company, a Board lessee. The Louisiana Supreme Court rejected the claim on the basis of the Board's sovereign immunity and held that the Board may not be sued in tort. Miller involved a claim in tort against the Board for the death of an employee of a Board lessee. The Louisiana Supreme Court held that "From an examination of the Constitution and the Acts of the legislature dealing with the Dock Board, it is apparent that the right to sue the Dock Board in tort has not been granted."

Accordingly, it is our opinion that the motion to dismiss the action in tort should be granted.

Second: Is the Board immune from actions arising in contract? Respondent has cited no case in which the Board has been held immune from con-

1. Kossick v. United Fruit Co., 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961);

Atlantic & Gulf Stevedores, Inc. v. Donovan, 5 Cir., 1960, 274 F.2d 794.

tract liability. After exhaustive research, we have likewise been unable to supply such authority. The Louisiana decisions are contrary to the Board's defense.

The Board supports its claim of immunity in contract suits by citing Lamport & Holt v. Board of Com'rs, 137 La. 784, 69 So. 174 (1915), and Cobb v. Louisiana Board of Institutions, 229 La. 1, 85 So.2d 10 (1955). Lamport no longer reflects the law of Louisiana and Cobb is not applicable here. Lamport, decided in 1915, involved a claim against the Board to recover for water damage to bags of coffee which were stored in sheds owned by the Board. Recovery was denied because there were no funds from which damages could be paid. The basis of that holding is no longer valid because the Louisiana Legislature subsequently passed Act 14 of the Extraordinary Session of 1915 leaving to the discretion of the Board the right to fix such wharfage fees and charges as it deemed necessary. Prior to the legislative enactment the Board could charge only such fees as were necessary to maintain its docks, sheds and other facilities. Lamport was in effect overruled by the Louisiana Supreme Court in Fouchaux when the Court held:

"Therefore, since the effective date of the 1915 act the Board may charge, and, so far as we know, it may have charged rates sufficient to provide for payment of all judgments which may be rendered against it, * * * we think, therefore, that, since the Supreme Court, [in Lamport], based its decisions squarely and solely on that fact— that there was not and could be no fund out of which such judgments could be paid—the result reached there is not necessarily controlling here."

It is true that in the Cobb case, supra, recovery was denied in contract in a suit against the Louisiana Board of Institutions, an admitted unincorporated administrative agency. The Louisiana Supreme Court in Cobb refused to make any distinction between actions in tort and those in contract in suits against the State. The decisions involving the immunity of the Dock Board were specific in granting "tort immunity," without reference to possible immunity in contract.

The Louisiana Supreme Court's decision in Cobb pointed out the fact that the Louisiana Board of Institutions is an unincorporated administrative agency, performing purely administrative functions and is in essence the State itself and there are no exceptions to sovereign immunity from suits against the State.

No Louisiana decision establishes such a status for the Dock Board.[2]

In Geary v. Board of Com'rs, 139 La. 781, 72 So. 245 (1916); Hartwig Moss Ins. Agency v. Board of Com'rs, 206 La. 395, 19 So.2d 178 (1944); and Leon Irwin & Co., Inc. v. Board of Com'rs of New Orleans, 176 La. 13, 145 So. 123

2. Compare the recent Louisiana decision in Carlisle v. Parish of East Baton Rouge, La.App., 1 Cir., 114 So.2d 62 (1959), where the Court stated:

"We are further not unmindful that the doctrine of governmental immunity from tort liability has been severely criticized as an anachronism initially based upon the royal prerogative and the personal immunity of the sovereign, and with little practical basis in this age when liability insurance is universally available. We are not wholly unsympathetic to suggestions that the doctrine should therefore be construed most conservatively, and limited rather than extended."

And again in a footnote on the same page:

"The American perversion of the old English maxim that the king can do no wrong is a conception of public irresponsibility against which one's moral sense rebels. That government is above the law is a notion that is hardly consistent with the doctrine of supremacy of law which has so long been taken as a basic tenet in our democratic faith." [Citing Fordham and Pegues, "Local Government Responsibility In Tort in Louisiana," 3 La.Law Rev. 720 (1941), 114 So.2d 62, at 68.]

(1932), the Louisiana Supreme Court upheld suits in contract against the Dock Board. The defense of sovereign immunity was not raised by the Board in any of these cases. Geary involved a contract for the construction of wharves for the Board. After completion of the inner wharf, plaintiff was notified that the contract was being cancelled for the construction of the outer wharf. The Louisiana Supreme Court held that plaintiff was entitled to sue for damages for breach of contract resulting from the cancellation, but that plaintiff failed to prove the extent of his damages. Hartwig Moss Ins. Agency, supra, involved a brokerage contract for a five-year period. Upon cancellation of the contract by the Board, plaintiff brought suit. The Louisiana Supreme Court found the contract to be void as contravening public policy. However, the case was decided on the basis of public policy and contract law. The Court said (19 So.2d at 182):

> "Unquestionably it [Dock Board] is vested with authority to employ an insurance agent or broker to procure the issuance of such policies. If the agreement entered into by the Board with plaintiff on April 7, 1931, had gone no further than that, *its validity and binding effect could not be questioned.*" (Emphasis added.)

The Leon Irwin & Co. case, supra, involved another brokerage contract in a suit against the Dock Board. There the Louisiana Supreme Court found that, as a matter of law, there was no contract with the Board, but the case was decided on its merits employing contract law.

Since the filing of respondent's defense of sovereign immunity, libelant has pled in a supplemental libel that the Board is estopped from claiming immunity to suit as an agency of the State of Louisiana. The supplemental libel avers that libelant's application to the respondent Board for the services of discharging a cargo of bulk sugar from the SS FOLKE BERNADOTTE was subject to the Board's published tariff specifying rates, rules and regulations for handling of commodities through its Bulk Handling Facility; that libelant paid for these services on the Board's invoice to it based on the provisions of the tariff; that the Board's operation of the Facility is a purely private or proprietary function, not governmental and that the Board enters into contracts with persons for the use of the Facility; that libelant in entering into its agreement with the Board for use of the Facility relied on the provisions of the Board's tariff, particularly Section 6, in which no mention was made that the Board claimed sovereign immunity as a State agency to suits in contract or tort growing out of the use of the services at the Facility; that Section 6 of the tariff provided conditions and instances of vessel and equipment damage for which the Board would assume or accept no responsibility. Libelant concluded that the Board having received all of the benefits accruing to it under said tariff is now estopped from claiming that it cannot be sued for breach of contracts made thereunder because of sovereign immunity.

In Louisiana the doctrine of estoppel[3] applies to the State and its

---

3. As stated in Shirey v. Campbell, La. App., 2 Cir., 151 So.2d 557 (1963):

"Equitable estoppel is the effect of the voluntary conduct of a person whereby he is barred and precluded, both at law and in equity, from asserting rights against another person relying on such conduct; and it arises where a person, by his acts, representations or admissions, or even by his silence when it is his duty to speak, intentionally or through culpable negligence, induces another to believe that certain facts exist and the other person rightfully relies and acts upon such belief and will be prejudiced if the former is permitted to deny the existence or the truth of such facts. Public policy and good faith are the bases of the doctrine, the purpose of which is to afford protection against injustice by denying to a person the right to repudiate his acts, admissions, or representations which have been relied upon by the person to whom they were directed and whose conduct they were intended to and did influence."

subdivisions to the full extent that it does to individuals. State ex rel. Shell Oil Co. v. Register of State Land Office, 193 La. 883, 192 So. 519 (1939), and the numerous authorities cited therein. See also Police Jury of Richland Parish v. Caldwell & Co., 5 Cir., 1928, 26 F.2d 74.

The Shell case, supra, was a mandamus proceeding to compel the Register to accept the rental tendered by the Shell Oil Company to keep an oil, gas and mineral lease in force for another year. The lease had been maintained and the Register had accepted lease payments for 1937 and 1938. In 1939 the Register refused to accept payment on the grounds of irregularities in newspaper publications concerning the lease in 1936. In upholding the plea of estoppel against the State, the Court said:

"The State has two classes of powers: the one legislative, public, governmental, in the exercise of which it is a sovereignty and governs its people; the other, proprietary quasi-private, conferred upon it not for the purpose of governing its people but for the private advantage of the inhabitants of the State itself as a legal personality.

"This distinction as applied to estoppel is made quite plain * * *. It is, however, quite well settled that when the State makes itself a party to an action *or to a contract* or grant in its proprietary capacity, it is subject to the law of estoppel as other parties litigant or other *contracting parties*." (Emphasis added.)

The Louisiana Supreme Court in Cobb, supra, referring to the Shell case, and to estoppel against the State, said:

"The Court [in Shell] simply held that, when the State contracts, it is like a person; that it cannot receive the benefits of the agreement and not assume its burdens and that therefore the doctrine of estoppel applies to it to the full extent that it does to individuals."

Applying this principle to the present case, we find that the Board charges fees for the use of its Bulk Handling Facility and that in return shipowners and users of the Facility have a right to expect that the services furnished them by the Board will be performed in a reasonable manner, especially with regard to any damage to the vessel while docked at the Facility. The Board's tariff, Item 335, provides that:

"The Board will assume no responsibility for the damage to vessel parts incurred by reason of concealed or inadequately protected fastenings, attachments, covers and parts of the ship projecting into the bulk cargo. The Board accepts no responsibility for any damage to vessel or equipment which might occur while lowering or raising stevedore equipment into or out of vessels, nor for normal wear and tear of vessels and barges engaged in the Bulk Trade."

■ It is clear that under the circumstances stated in Item 335, the Board will not be liable. Likewise, it is reasonable to infer that in other circumstances, such as negligent discharge of cargo causing damage to a vessel, the Board will be liable.[4] It is thus that

---

4. Some excerpts from the official report of the Board to the Governor of Louisiana, dated September 14, 1964, are pertinent here:

"* * * it is estimated that $1,909,-700,000 worth of foreign cargo crossed the wharves of the Port in calendar 1963."

* * * * *

"Waterborne commerce moving through the Port in calendar 1963 totaled 79,-130,710 tons. * * *"

* * * * *

"Since then (1956) three *private export elevators* have been constructed on the river. * * *" (Emphasis supplied.)

* * * * *

"* * * For these reasons and in accord with this Board's *long standing policy of support for private enterprise* whenever private enterprise was ready, *willing, and able to do the job required,* the Board, during the year, considered the leasing of its facility for

the Board makes representations of its policy in regard to liability to the entire world through its tariff regulations. Libelant as a foreign shipowner had relied on those representations. The Board is, therefore, estopped by its prior actions and representations as well as by the acceptance of payment by libelant for such services from claiming sovereign immunity as a State agency. As Lord Coke expressed it, estoppel is so called "because a man's owne act or acceptance stoppeth or closeth up his mouth to allege or plead the truth." 31 C.J.S. Estoppel § 1 et seq.

The Board's motion to dismiss is, therefore, denied.

operation as a public elevator." (Emphasis supplied.)

The report states that in 1964 the grain elevator was in fact leased to a private Louisiana corporation. The report also demonstrates the Board's participation to develop a world trade center at the foot of Canal Street, and that it expends some $13,000,000 per year for new construction and modernization; that the value of the Port's facilities has increased from $49,928,243 in 1940 to $112,568,173 in 1964. The net worth of the Board in 1940 was $5,699,000 whereas in 1964 it was $59,750,000. It also anticipates spending some $193,582,000 for new construction.