**J. G. SHOTWELL, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 1127.**

United States District Court
E. D. Washington, N. D.

July 7, 1958.

908

J. K. Cheadle, Spokane, Wash., for plaintiff.

William B. Bantz, U. S. Atty., Spokane, Wash., for defendant.

DRIVER, District Judge.

Defendant, United States, has moved for summary judgment. The facts on which the motion must be decided are set out in the amended complaint, two affidavits in support of the motion, and two affidavits in opposition thereto.

Amended Complaint

Plaintiff's amended complaint may be summarized as follows:

On April 3, 1951, defendant, through its Bureau of Reclamation (hereinafter called the Bureau), Department of the Interior, entered into a contract with J. A. Terteling & Sons, Inc. (hereinafter called Terteling), for the construction of a canal and wasteway in connection with the Columbia Basin Project. The contract provided that in the performance of the work the contractor could obtain sand and gravel without charge from the Potholes pit acquired by defendant for use in the construction of the project. On June 19, 1951, Terteling entered into a subcontract with plaintiff whereby the latter was to furnish 25,000 cubic yards of concrete aggregates at a price based on production from the Potholes pit. In the performance of the subcontract the plaintiff, as he had a right to do, entered upon the Potholes pit premises and erected his aggregate processing plant with the approval or acquiescence of the Bureau "personnel" who designated the place where the plant should be erected. The aggregates produced at the plant by plaintiff were inspected by Bureau "inspectors", in accordance with the specifications of the prime contract.

During and after the time the plaintiff was performing the subcontract, the Bureau had other contracts for construction of various features of the Columbia Basin Project. The other contractors, as well as Terteling, were permitted to obtain concrete aggregates for performance of their contracts free of charge from the Potholes pit.

Bureau "personnel" encouraged plaintiff to extract and process additional concrete aggregates from the Potholes pit to supply the other contractors with concrete aggregates and gave plaintiff permission to sell the same to such other contractors. Plaintiff did then process such additional aggregates, which were inspected by Bureau "inspectors" at the plaintiff's plant and were sold to the other contractors.

Bureau "personnel" cooperated with the plaintiff in estimating the requirements of concrete aggregates for the other contractors, and plaintiff produced aggregates in accordance with such estimates. In May, 1953, plaintiff had in stockpiles on the Potholes pit approximately 9,000 cubic yards of aggregates produced as part of the estimated requirements for the other contractors of the Bureau.

An Act of Congress authorized the Secretary of the Interior, in his discretion, to permit removal from government lands such as the Potholes pit of sand and gravel, with or without competitive bidding, and the authority was delegated and redelegated so as to vest the same in P. R. Nalder, District Manager of the Columbia Basin Project. The District Manager had knowledge of plaintiff's operations in producing aggregates and selling the same to contractors other than Terteling, and specifically of the stockpiling of the 9,000 cubic yards of aggregates on hand in May, 1953. Plaintiff's operations were encouraged by "personnel" of the Bureau who were under the supervision of the District Manager. The plaintiff was permitted to operate just as though he had a formal permit, and, in effect, did have a permit to extract free of charge and to process concrete aggregates from the Potholes pit exclusively for sale to Bureau contractors with contracts which contained provisions similar to those in Terteling's prime contract (i. e., permission to obtain concrete aggregates from the Potholes pit free of charge). The plaintiff at his own substantial expense produced and stockpiled the 9,000 cubic yards of

aggregates on hand in May, 1953, in reliance upon such permit and the course of conduct of "defendant's officers and employees."

On May 19, 1953, the District Manager directed plaintiff to vacate the Potholes pit and the defendant converted the aggregates to its own use and sold the same to plaintiff's damage in the sum of $13,950.

### Affidavits in Support of Motion For Summary Judgment

The affidavit of P. R. Nalder recites: On and subsequent to December 21, 1952, P. R. Nalder was the District Manager of the Columbia Basin Project. One of his duties was the granting or refusing to grant permits for the removal of aggregates from project lands. Attached to Nalder's affidavit as exhibits are documents with notations of publication in the Federal Register, showing the delegation of authority to grant permits from the Secretary through subordinates to the officer in charge, who was the Project Manager. As shown by such documents, permits were required to be in writing, and unless a permit was issued on competitive bids, after advertising, a charge was to be made for the aggregates, based on local prevailing rates. The land known and described as the Potholes pit at all times involved in the present action was owned by the United States, and was being administered by the Bureau for the purposes of the Columbia Basin Project. No permit was granted to the plaintiff to remove aggregates from the Potholes pit, or to extract the same therefrom and stockpile it for purposes of sale. Nalder had no knowledge of the removal and sale, or of the stockpiling of aggregate from the Potholes pit by the plaintiff until on or about May 19, 1953, when he promptly by letter informed plaintiff that he had no title to such aggregate, and requested that he immediately vacate the premises.

The affidavit of H. A. Parker states: At all times pertinent to the present action prior to December 21, 1952, H. A. Parker was the District Manager of the Columbia Basin Project, and as such had the same authority as his successor, P. R. Nalder, with reference to permits for the removal of aggregates from project lands, including the Potholes pit. No employee of the Bureau subordinate to Parker had any authority to grant such permits, and no one, including Parker, had authority to grant oral permits. No permit was ever granted to the plaintiff. Parker had no knowledge of the removal and sale or the stockpiling of aggregate from the Potholes pit while he was in charge of the Columbia Basin Project, by the plaintiff.

### Affidavits In Opposition to Motion for Summary Judgment

A summary of the affidavit of plaintiff is as follows: The plaintiff knows all of the allegations of fact in the amended complaint to be true of his own personal knowledge, "or on information and belief" believes "them to be true." In the summer or fall of 1951, accompanied by his superintendent, William McConnell, plaintiff called on Marvin Hawkins "project materials engineer" for the Bureau, in his office in Ephrata, Washington. The conference was for the purpose of determining the quantity of concrete aggregates that would probably be needed by the various Bureau contractors within reasonable hauling distance of the Potholes pit in 1952–1953. The Bureau, and Hawkins in particular, encouraged plaintiff to sell concrete aggregates to various contractors in the summer and fall of 1951, and, in one instance, to sell to a supplier who was not a contractor. Hawkins also encouraged plaintiff to produce and stockpile estimated requirements of 10,000 cubic yards for such contractors in 1952 and 1953. Plaintiff accordingly produced and stockpiled about 10,000 cubic yards which were inspected by Bureau inspectors.

Plaintiff, from long and extensive experience, including Bureau contracts, is specially capable, expert and proficient in the extraction and production of concrete aggregates. He "was careful to get and did personally get permission to produce and stockpile for future sale" to various Bureau construction con-

tractors on the Columbia Basin Project, the approximately 10,000 cubic yards of concrete aggregate materials, which are the subject of the current action.

Plaintiff is "informed" and believes "that the methods and procedures within the Bureau of Reclamation regarding reports and correspondence are such that H. A. Parker, then project manager of the Columbia Basin Project, had knowledge in 1951 and 1952" of plaintiff's operations in the Potholes pit as set forth in the amended complaint and in the plaintiff's affidavit.

The affidavit of William McConnell in effect states: From the spring of 1951, until late fall of that year, William McConnell was superintendent for plaintiff in charge of the plaintiff's aggregate processing plant at the Potholes pit. In the summer of 1951, the plant was erected at a place selected or pointed out by Roy Krohse, a geologist of the Bureau. After it was erected, plaintiff's organization, under McConnell's supervision, commenced producing concrete aggregates in the amount of approximately 25,000 cubic yards, under a subcontract between plaintiff and Terteling, a Bureau contractor. McConnell's "principal contacts" with the Bureau were through Hawkins and Roy Krohse of the Ephrata, Washington office, and a Bureau inspector from the Othello office. The inspector came in several times a week to take samples and check on hourly sand samples taken by McConnell. These samples were taken to see that the sand and gravel were being produced in accordance with the Bureau's specifications for concrete aggregate.

From time to time during the late summer and fall of 1951, plaintiff's organization, under McConnell's supervision, sold concrete aggregates to other construction contractors of the Bureau engaged in construction work on the Columbia Basin Project. Hawkins and a Bureau inspector requested plaintiff's organization to sell finished materials to an Othello concrete dealer for use in concrete for a contract held by Terteling and to supply other contractors in the Othello area. They were particularly concerned as to the effect of sub-standard aggregates on the quality of the concrete supplied in Othello, and asked McConnell to make a proposal to the dealer whereby the plaintiff's organization would stockpile aggregates at Potholes for him for use in Bureau contracts. Bureau "personnel" brought many construction contractors into the Potholes pit area, and in effect acted as intermediaries between plaintiff's organization and other contractors who were interested in buying concrete aggregates for use in their Bureau work. Because of the high quality of the concrete produced by plaintiff's organization, the Bureau in general, and Hawkins in particular, encouraged plaintiff to sell materials to other Bureau contractors.

At various times during the late summer of 1951, plaintiff and McConnell discussed the outlook for future concrete construction work with Hawkins. Hawkins was concerned by the almost total absence of suitable Bureau specification concrete aggregates in the area. Plaintiff's organization was interested in the possibility of producing aggregates for some of the forthcoming Bureau work. Accordingly, in the fall of 1951, McConnell asked Hawkins to determine if plaintiff could produce and stockpile a quantity of specification aggregates at the Potholes pit after the quantities specified in plaintiff's Terteling contract had been produced. Hawkins said that he would mention the matter to interested contractors in the area but "warned that negotiations with reference to disposition of such stockpiled materials would have to be between the Shotwell organization and the prospective buyer." Sometime thereafter "presumably having discussed the subject" with Bureau officials in Ephrata, Washington, Hawkins informed McConnell that the Bureau was agreeable to his proposal to produce and stockpile concrete aggregates for future sale to Bureau construction contractors for use in construction of the Columbia Basin Project. McConnell and Hawkins estimated the quantities of ag-

gregates that certain forthcoming projects would require, and plaintiff produced and stockpiled the approximate quantities indicated in the estimate.

McConnell does not know H. A. Parker or P. R. Nalder. Plaintiff's processing plant at the Potholes pit was frequently visited by one or several carloads of officials in Bureau cars. On many occasions Hawkins was with the group and frequently guided visitors about the plant while explaining "the mechanics of the processing equipment." McConnell left the Potholes pit to go to another job in a different locality in the late fall of 1951.

### Summary Judgment
### (When Pleading States Claim for Relief)

Plaintiff argues that the amended complaint states a claim for relief, and therefore the affidavits in support of the motion for summary judgment can do no more than contradict the allegations of his pleading, and thus raise an issue of fact which precludes the granting of the motion. He cites Frederick Hart & Co. v. Recordgraph Corporation, 3 Cir., 169 F.2d 580, 581, and quotes, along with other language of the opinion, the following excerpt:

> "* * * It is well-settled that on motions to dismiss and for summary judgment, affidavits filed in their support may be considered for the purpose of *ascertaining whether an issue of fact is presented, but they cannot be used as a basis for deciding the fact issue.* An affidavit cannot be treated, for purposes of the motion to dismiss, as proof contradictory to well pleaded facts in the complaint. Farrall v. District of Columbia Amateur Athletic Union, 1946, 80 U.S.App.D.C. 396, 153 F.2d 647; United States v.

Association of American Railroads, D.C.Neb.1945, 4 F.R.D. 510; 2 Moore's Federal Practice (2nd ed. 1948) pages 2254, 2255."

The foregoing doctrine which prevails in the Third Circuit and finds some support elsewhere, misconstrues the plain language as well as the purpose of the summary judgment rule.[1] It is contrary to the construction of the rule by the Supreme Court's Advisory Committee, which formulated the civil rules. The doctrine has not been accepted by the majority of the federal courts and, perhaps most important of all so far as this court is concerned, it is not the law in the Ninth Circuit.

 Paragraph (c) of Rule 56, in part recites:

> "* * * The judgment sought shall· be rendered forthwith if the pleadings, *depositions,* and *admissions* on file, together with *the affidavits,* if any, show that there is no *genuine* issue as to any *material* fact and that the moving party is entitled to a judgment as a matter of law." (Emphasis added.)

The language of Rule 56 thus clearly indicates that the sources of information therein mentioned, other than the pleadings, are to be considered in determining whether or not there is a "genuine" issue of fact. The manifest purpose of the rule is to enable an adverse party to pierce the formal and general language of a pleading by using other extrinsic materials to show with precision and particularity that no real, substantial issue of fact actually exists, and when such a showing is made by the moving party mere general allegations or denials in opposition are not sufficient to prevent the granting of the motion for summary judgment.[2]

1. Fed.Rules Civ.Proc., Rule 56, 28 U.S.C.A.

2. Engl v. Aetna Life Ins. Co., 2 Cir., 1943, 139 F.2d 469, 472, 473. The opinion of the court was written by Judge Charles E. Clark who was the reporter of the Civil Rules Advisory Committee throughout the entire eighteen years of

its existence. In accord are the following Ninth Circuit cases: Piantadosi v. Loew's Inc., 1943, 137 F.2d 534, 536; Lindsey v. Leavy, 1945, 149 F.2d 899, 902; Koepke v. Fontecchio, 1949, 177 F.2d 125, 127; Byrnes v. Mutual Life Insurance Company of New York, 1954, 217 F.2d 497, 500.

General acceptance of plaintiff's contention would destroy Rule 56 just as effectively as if it were expressly repealed. If a pleading fails to state a claim for relief, it may successfully be attacked by motion to dismiss under Rule 12(b), and, according to plaintiff's theory, if it does state a claim for relief, it cannot on extrinsic facts be successfully attacked by motion for summary judgment. Thus, the motion for summary judgment would be only a useless duplication of the motion to dismiss.[3]

In October, 1955, the Advisory Committee submitted to the Supreme Court a printed report of proposed amendments to the civil rules. The committee recommended that Rule 56(e) be amended by adding at the end thereof the following:

"When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him." [4]

The proposed amendments were never acted upon by the Supreme Court and the committee was discharged on June 14, 1956 (under circumstances which need not be related here). But the proposed amendment to Rule 56 was submitted only for clarification. It was intended to definitely and clearly express what the committee regarded as the correct construction of Rule 56, and to repudiate what was considered to be an erroneous construction typified by the Third Circuit's Frederick Hart & Co. v. Recordgraph Corporation, supra. In its October, 1955 draft (p. 57), the committee explained the proposed amendment to Rule 56(e) in a note, the pertinent portion of which is set out herein on the margin.[5]

The Ninth Circuit Court of Appeals appears to be in agreement with the Advisory Committee's construction.[6] The

---

3. Lindsey v. Leavy, 9 Cir., 1945, 149 F.2d 899, 902.

4. Advisory Committee's Report of Proposed Amendments to the Rules of Civil Procedure for the United States District Courts, October 1955, pp. 57, 58.

5. *Subdivision (e).* Some recent cases, particularly in the Third Circuit, have held that a mere allegation in the pleading is sufficient to create a genuine issue as to a material fact, and thus prevent summary judgment, even though the pleader has made no attempt to controvert affidavits and other evidentiary matter presented by his opponent; e. g., Frederick Hart & Co. v. Recordgraph Corp., 3 Cir., 1948, 169 F.2d 580, 581; Reynolds Metals Co. v. Metals Distintegrating Co., D.C.N.J.1948, 8 F.R.D. 349, affirmed 3 Cir., 1949, 176 F.2d 90; Chappell v. Goltsman, 5 Cir., 1950, 186 F.2d 215, 218; and cases cited in 6 Moore's Federal Practice Par. 56.11 [3], n. 16 (2d ed. 1953). This line of cases is termed "patently erroneous" in Note, 99 U. of Pa.L.Rev. 212, 214–215 (1950), citing many contrary authorities. The purpose of Rule 56 is to pierce the formal allegations of the pleadings and reach immediately the merits of the controversy. If pleading allegations are sufficient to raise a genuine issue as against uncontradicted evidentiary matter, this remedy then becomes substantially without utility. Engl v. Aetna Life Ins. Co., 2 Cir., 1943, 139 F.2d 469, 473. The view of most cases and commentators is that, where the motion for summary judgment is supported by depositions or affidavits, the opposing party must make a similar presentation to show the existence of a genuine issue of fact, or suffer judgment to be entered. 6 Moore's Federal Practice Par. 56.11 [3], n. 21 (2d ed. 1953), and cases there cited; Id. at Par. 56.15 [2] Asbill & Snell, Summary Judgment Under the Federal Rules —When An Issue of Fact Is Presented, 51 Mich.L.Rev. 1143, 1159–1165 (1953); Shientag, The Summary Judgment 24 (1941); Kennedy, The Federal Summary Judgment Rule, 13 Brooklyn L.Rev. 5 (1947); Comm., "Genuineness" of Issues on Summary Judgment, 4 Fed.Rules Serv. 940.

The amendment to subdivision (e) states this last principle and thus makes it clear that pleading allegations cannot, in themselves, create a genuine issue of material fact when summary judgment is sought. * * *

6. See the 4 Ninth Circuit cases cited in footnote 2, supra.

following is an excerpt from the opinion of that court in Byrnes v. Mutual Life Insurance Company of New York, cited above in footnote 2 [217 F.2d 500]:

> "In determining the matter, resort is had to extrinsic facts through affidavits, admissions and the like in order to find out if there is a real issue. This implies that such a finding will be made despite the fact that the pleadings as they stand present such issue."

■ The affidavits for and against the motion for summary judgment in the instant case should be considered, but Rule 56 makes certain requirements which they should meet. Paragraph (e) in pertinent part provides:

> "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."

### Summary of Undisputed Facts

■ Viewing the amended complaint and the affidavits in the light of the principles above discussed, and the requirements of Rule 56(e), it appears that the basic undisputed facts upon which the motion for summary judgment is to be decided may briefly be summarized as follows:

The United States was at all times the owner of the Potholes pit, acquired for use in connection with the Columbia Basin Project. Terteling, a prime government contractor, had the right under his contract to obtain the aggregate for making concrete from the pit, and plaintiff had a subcontract to furnish such aggregate to Terteling. In the performance of his subcontract, plaintiff entered the pit and set up thereon his aggregate processing plant and produced aggregates under the direction and supervision of representatives and inspectors of the Bureau. After he had performed the Terteling contract, plaintiff continued to produce and stockpile aggregates from the Potholes pit for sale to other government contractors with whom he did not have subcontracts. The taking by defendant of 9,000 or 10,000 cubic yards of such stockpiled aggregates is the basis of the present action. Plaintiff was given what amounted to an oral permit to thus extract the materials from the Potholes pit, and to stockpile and sell them, by Marvin Hawkins, project materials engineer for the Bureau. An inspector and other representatives of the Bureau sanctioned or acquiesced in his operations. H. A. Parker and P. R. Nalder who were, successively, in charge of the Columbia Basin Project as District Managers, had authority to grant a permit, but none of their subordinates had such authority. Parker and Nalder each denies that he had any knowledge of plaintiff's operations other than under the subcontract with Terteling, until Nalder learned of them and immediately notified plaintiff to desist.

### Permit Required for Removal of Materials from Government Land

The Potholes pit was subject to the provisions of § 387, Title 43 U.S.C.A., which in pertinent part reads:

> "The Secretary, in his discretion, may (a) permit the removal, from lands or interests in lands withdrawn or acquired and being administered under the Federal reclamation laws in connection with the construction or operation and maintenance of any project, of sand, gravel, and other minerals and building materials with or without competitive bidding: *Provided*, That removals may be permitted without charge if for use by a public agency in the construction of public roads or streets within any project or in its immediate vicinity; * * *".

By orders and directives published in the Federal Register, the Secretary of the Interior duly delegated his authority through subordinates to the officer in charge, or District Manager of the project. The orders and directives by which the authority was delegated and redelegated from the Secretary of the Interior to the District Manager, imposed the following conditions upon the granting

of permits to remove sand and gravel from government lands such as the Potholes pit: Unless an approved standard form of permit was used, without deviation, there must be advance legal review and approval of the legal phases of all documents, matters and transactions handled pursuant to the redelegated authority. Such review and approval must be by the Regional Counsel or his authorized subordinate.

Plaintiff claims that he had an interest in the nature of a profit apprendre in the Potholes pit and the stockpiled aggregates extracted therefrom, and that defendant either converted plaintiff's aggregates to its own use, or trespassed upon his right and interest therein to his damage, and that he is entitled to recover their value.

Under either alternative theory, plaintiff cannot prevail unless he had the right to take the sand and gravel from the government's land. Under the statute cited above, such a right could be given in the form of a permit only by the Secretary of the Interior, or a subordinate to whom he had delegated the authority. Assuming that plaintiff had an oral permit, Hawkins, the project materials engineer from whom he received it did not have authority to grant it. Only the District Manager, Parker or Nalder, respectively, had that authority, and plaintiff does not claim that he received a permit from either of them.

### Estoppel

Plaintiff contends that the defendant is estopped to deny that he had a permit to extract the materials from the Potholes pit. Necessarily such claimed estoppel must be based upon representations or conduct of Parker or Nalder, the District Managers, who had authority to grant the permit. The Government is not subject to estoppel on the same basis as a private person. There must be authority in the government agent and he must act within the scope of that authority. In a case cited by plaintiff, namely, Smale & Robinson, Inc. v. United States, D.C., 123 F.Supp. 457, the rule is stated (opinion at page 465) as a quotation from Ritter v. United States, 3 Cir., 28 F.2d 265, 267, as follows [123 F.Supp. 465]:

> " 'The acts or omissions of the officers of the government, if they be authorized to bind the United States in a particular transaction, will work estoppel against the government, if the officers have acted within the scope of their authority.' "

On the same page of the opinion in the Smale & Robinson case, the author, Judge Mathes, points out that lack of authority in the agent is fatal to any claim of estoppel based upon the agent's conduct, and that anyone dealing with a government agent is held to have notice of the limits of his lawful authority.

It is not claimed that Parker or Nalder made any representations to, or had any direct dealings with, plaintiff or his superintendent. The amended complaint alleges that Nalder had knowledge of the operations of plaintiff in the production of aggregates for contractors other than Terteling, and plaintiff's affidavit recites on information and belief that the methods and procedures within the Bureau regarding reports and correspondence were such that Parker had such knowledge also. But there is no showing by plaintiff as to when, or in what manner, Nalder and Parker learned of plaintiff's extra-Terteling operations, or how much or how little of the details of such operations became known to them. Even if it be assumed for the purpose of deciding the motion that Parker and Nalder had knowledge of all of plaintiff's operations, and for a considerable period of time silently acquiesced therein by failing to take action to stop them, nevertheless, plaintiff has not made out a case of estoppel. The United States is not estopped by acts or conduct of its officers to question an arrangement or agreement that is not sanctioned by law.[7]

7. United States v. City and County of San Francisco, 310 U.S. 16, 32, 60 S.Ct. 749, 84 L.Ed. 1050.

In the present case, the governing statute did not sanction the granting of a permit to plaintiff, a private person, to remove materials from the Potholes pit without charge for stockpiling and sale. Moreover, when no approved standard form of permit was used, the district manager, by the terms of his delegated authority was required to obtain advance legal review and approval from the Regional Counsel of the Bureau of the legal phases of all documents, matters and transactions in connection with the granting of a permit to plaintiff to remove the materials from the government pit. Obviously there was no compliance with such requirement.

### Conclusion

Since the undisputed facts disclose that plaintiff did not have the right to extract the aggregate from the defendant's pit by lawful permit, and the defendant is not estopped to deny that plaintiff had such permit, the defendant's motion for summary judgment will be granted.