**UNITED STATES of America,**
**Plaintiff-Appellant,**

v.

**GEORGIA–PACIFIC COMPANY,**
**Defendant-Appellee.**

No. 23572.

United States Court of Appeals
Ninth Circuit.

Jan. 8, 1970.

William M. Cohen (argued), Asst. Atty. Gen., Land & Natl. Res. Div., Dept. of Justice, Shiro Kashiwa, Asst. Atty. Gen., Howard O. Sigmond, Roger P. Marquis, Dept. of Justice, Washington, D. C., Sidney I. Lezak, U. S. Atty., Joseph E. Buley, Asst. U. S. Atty., Portland, Or., for appellant.

Norman J. Wiener (argued), Helen F. Althaus, Robert S. Miller, of King, Miller, Anderson, Nash & Yerke, Portland, Or., for appellee.

Before HAMLEY and HUFSTEDLER, Circuit Judges, and LEVIN *, District Judge.

GERALD S. LEVIN, District Judge:

This suit was instituted by the United States Government to secure declaratory

---

* Honorable Gerald S. Levin, United States District Judge for the Northern District of California, sitting by designation.

relief and specific performance of an agreement entered into in 1934 between the Government and a predecessor in interest of the Georgia-Pacific Corporation. The Government brought suit in 1967 pursuant to 28 U.S.C. § 2201. The trial court had original jurisdiction under 28 U.S.C. § 1345. This court has jurisdiction under 28 U.S.C. § 1291. From a judgment in favor of Georgia-Pacific and denying equitable relief to the Government, the Government has taken this appeal.

The facts of the case are as follows: Coos Bay Lumber Company, hereafter referred to as "Lumber Company", owned certain timberlands in 1934, consisting of approximately 58,900 acres in Coos and Douglas Counties, Oregon, both within and without the northern exterior boundaries of the Siskiyou National Forest as it existed in 1934. Those timberlands are known as the "Eden Ridge Tract".

In 1933 Oregon's economy and lumber industry were in a depressed condition. In the 1930's many timber owners in the Northwest abandoned cutover lands to eliminate further payment of ad valorem taxes. When the lands were thus abandoned, the counties foreclosed the tax liens and provided fire protection to the lands and also offered the lands for sale at tax foreclosure sales. Sometimes small landholders located and attempted to establish homesteads in isolated, fertile valleys of the area. These homesteads located in forest areas tended to increase fire hazards.

In 1933, the president of Lumber Company proposed to representatives of the Forest Service that the Government extend the boundaries of the Siskiyou National Forest to include all of the Eden Ridge Tract and that Lumber Company would thereafter convey to the Government its forest lands in the Eden Ridge Tract after the forest growth thereon

had been harvested. In 1934, a document (hereafter referred to as the "1934 Document") was executed under seal incorporating the above proposal. The signatories thereto were Lumber Company, the then owner of the lands, and the then Acting Regional Forester of the United States Forest Service, Region 6.

By letter dated April 20, 1934, Senator McNary asked for the Forest Service's comments on a letter dated April 16, 1934, from John D. Goss concerning a proposed bill which resulted in the passage by Congress of Public Law 131, referred to hereafter. The Forest Service replied on April 25, 1934. Letters from Goss and from Acting Regional Forester Sherman recommended passage of the bill and referred to Lumber Company's proposed agreement to donate cutover forest land if the boundaries of the forest were extended to include Lumber Company land.

The boundaries of the Siskiyou National Forest were thereupon extended to include all the lands described in Schedule "B" of the 1934 Document.[1]

The 1934 Document was recorded on June 10, 1935, in Douglas County, Oregon. By this unambiguous Document, the Lumber Company assumed a continuing duty to convey lands to the Government as they were cut over. As consideration, the Government extended the boundaries of the Siskiyou National Forest, thus giving the Lumber Company additional fire protection. This is what the Lumber Company wanted in exchange for this duty to convey these lands over a period of time, and that is what it received. When the Lumber Company entered into this bargain, it thought that there would be added fire protection for it since it was within the boundaries of the National Forest. The 1934 Document created a clear binding contract. Congress performed its function of acceptance and at the same time,

1. Public Law 131, 74th Cong. 1st Sess., approved June 13, 1935, 49 Stat. 338. Section 2 thereof reads in pertinent part:
"Lands hereafter conveyed to the United States within the above-described area upon acceptance of title, shall become parts of said Siskiyou National Forest and subject to all laws relating thereto. * * * "

by changing the boundaries of the Siskiyou National Forest, provided consideration for the contract.

From 1936 through 1941, Lumber Company conveyed to Government a total of 9,356.82 acres of land within the exterior boundaries of the Siskiyou National Forest. Of the lands conveyed, 2,938.37 acres of land were from those described in Schedule "A" of the 1934 Document, being within the original boundary of the Siskiyou National Forest, and 6,418.45 acres of land were from those described in Schedule "B" of the 1934 Document, being within the boundaries of the Siskiyou National Forest as extended by the Act of June 13, 1935, 49 Stat. 338.

Lumber Company conveyed the lands remaining in its ownership in the Eden Ridge Tract to Timber Company, together with other lands, by Deed dated July 10, 1956.[2] Georgia-Pacific acquired title to the lands from Timber Company by Deed dated December 17, 1962.

From 1934 through April 4, 1958, Lumber Company or its successors did not complete cutting and slash disposal on any quarter section or a portion thereof in the Eden Ridge Tract except for lands previously conveyed to Government as set forth herein.

Public Land Order [P.L.O.] 1610, 23 Fed.Reg. 2340, dated April 4, 1958, was issued after the exterior boundaries of the Siskiyou National Forest were extended by the Act of June 13, 1935. This Order retracted the northern boundary of the Forest, excluding lands described in Schedule "B" of the 1934 Document (except for lands previously conveyed) then owned by Georgia-Pacific, and re-establishing the northern boundary as it was before the 1935 extension. The maps of the Forest were changed and the personnel of the Forest Service then began acting as if this was no longer part of the National Forest. For all practical purposes it was not and is not a part of the National Forest.

Over the years the Government made no claim upon Lumber Company or its successors to convey any land under the 1934 Document. No assertion of ownership or other rights in the land was made until 1961 (with the exception of 1958, when Government, inferentially at least, asserted some ownership interest by discontinuing negotiations for a land exchange). During the same period of time, Government, without interference, allowed Georgia-Pacific to manage this timberland at a very considerable expense, meanwhile adding a great deal of value to it.

Based on the foregoing facts, the district court found that the 1934 Document was a valid contract, but whose purposes and objectives were frustrated by the retraction of the boundaries of the Siskiyou National Forest in 1958, thereby terminating the duty of Georgia-Pacific to convey any cutover lands pursuant to the 1934 Document. The district court found the 1958 retraction to constitute a failure of consideration, rendering the 1934 Document void and unenforceable.[3] We affirm the decision of the district court but on grounds other than those upon which its decision is based. The grounds upon which the decision of this court is founded are discussed hereafter.

*Equitable Estoppel*

■ Equitable estoppel is a doctrine adjusting the relative rights of parties based upon consideration of justice and good conscience. Smale & Robinson, Inc. v. United States, 123 F.Supp. 457,

2. The deed contained a clause reading: "SUBJECT, HOWEVER, to the restrictions, exceptions, reservations, conditions, limitations, interests and other matters, if any, appearing of record in the office of the County Recorder * * *."

3. The court also stated its Conclusion of Law IV as follows:

"Although not necessary to the decision in this case by reason of this Court's Conclusions in paragraph III immediately preceding, Government under the facts heretofore found would be and is estopped from asserting its right to any specific performance by Georgia-Pacific arising out of or under the 1934 Document."

463 (S.D.Cal.1954); Peoples National Bank v. Manos Brothers, Inc., 226 S.C. 257, 84 S.E.2d 857, 870, 45 A.L.R.2d 1070 (1954); 3 Pomeroy, Equity Jurisprudence §§ 801, 802 (5th ed. Symons 1941); 28 Am.Jur.2d Estoppel and Waiver § 28, at 629. Pomeroy has defined equitable estoppel as having the effect of absolutely precluding a party, both at law and equity

"[f]rom asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, of contract, or of remedy."

3 Pomeroy § 804, at 189. See also Dickerson v. Colgrove, 100 U.S. 578, 580, 25 L.Ed. 618 (1879); Bankers Trust Co. v. Pacific Employers Insurance Co., 282 F.2d 106, 112 (9th Cir. 1960). Equitable estoppel prevents a party from assuming inconsistent positions to the detriment of another party, Lebold v. Inland Steel Co., 125 F.2d 369, 375 (7th Cir. 1941) or, as stated in Bigelow, Law of Estoppel 603 (6th ed. Carter 1913), " 'He who keeps silent when duty commands him to speak shall not speak when duty commands him to keep silent.' " See also 31 C.J.S. Estoppel § 108, at p. 548.

■ Equitable estoppel is a rule of justice which, in its proper field, prevails over all other rules. City of Chetopa v. Board of County Com'rs., 156 Kan. 290, 133 P.2d 174, 177 (1943). An equitable estoppel will be found only where all the elements necessary for its invocation are shown to the court. The test in this circuit was reiterated in Hampton v. Paramount Pictures Corp., 279 F.2d 100, 104, 84 A.L.R.2d 454 (9th Cir. 1960):

"Four elements must be present to establish the defense of estoppel: (1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury. California State Board of Equalization v. Coast Radio Products, 9 Cir., 228 F.2d 520, 525." [4]

---

4. In a more recent case, United States for Use and Benefit of Fogle v. Hal B. Hayes & Associates, Inc., 221 F.Supp. 260, 264 (N.D.Cal.1963), the test as set out in *Hampton, supra,* was restated to require: (1) A false representation or concealment of a material fact or facts; (2) Knowledge on the part of the defendant of the true fact or facts; (3) Lack of knowledge and an absence of means of securing knowledge of the true facts, on the plaintiff's part; (4) An intent on the part of the defendant that the representation or concealment be acted upon by the plaintiff; and (5) Actual reliance by the plaintiff on the representation or concealment. [See cases cited therein.]

Other authorities rely on a somewhat different statement of analogous elements in order to make out a defense of equitable estoppel. One test that is followed in varying form is that set out in 3 Pomeroy § 805, at 191–192:

1. There must be conduct—acts, language, or silence—amounting to a representation or a concealment of material facts. 2. These facts must be known to the party estopped at the time of his said conduct, or at least the circumstances must be such that knowledge of them is necessarily imputed to him. 3. The truth concerning these facts must be unknown to the other party claiming the benefit of the estoppel, at the time when such conduct was done, *and at the time when it was acted upon by him.* 4. The conduct must be done with the intention or at least with the *expectation,* that it will be acted upon by the other party, or under such circumstances that it is both natural and probable that it will be so acted upon. There are several familiar species in which it is simply *impossible* to ascribe any *intention* or even *expectation* to the party estopped that his conduct will be acted upon by the one who afterwards claims the benefit of the estoppel. 5. The conduct must be relied upon by the other party, and, thus relying, he must be led to act upon it. 6. He must in fact act upon it in such a manner as to change his position for the worse; in other words, he must

Many kinds of activities—or inactivity—on the part of a defendant may permit the defense of equitable estoppel to be asserted against him. Obviously conduct amounting to fraud would suffice to raise an estoppel against a defendant, but it is clear that conduct far short of actual fraud will also suffice.[5] A party's silence, for example, will work an estoppel if, under the circumstances, he has a duty to speak.[6] A common example of this occurs when a plaintiff knowingly permits a defendant to make expenditures or improvements on property the latter believes to be his, but which in fact the plaintiff knows to be the plaintiff's property. In this case, equity may decree that the plaintiff is estopped from asserting title to the property in question.[7] As the court in Management & Investment Co.

v. Zmunt, 59 F.2d 663, 664 (6th Cir. 1932), said:

"It is axiomatic that equity will not grant relief to one who has stood by and permitted the expenditure of large sums of money upon the faith and belief that he does not deem his rights to be violated." [8]

In the instant case, the facts show that Government has engaged in just that kind of conduct which would render it liable to the defense of equitable estoppel, subject to the possible immunity therefrom enjoyed by Government, to be discussed hereafter.

Using the test previously enunciated by this Court in the *Hampton* and *California State Board of Equalization* cases, *supra*, we find all the requirements stated there to be met. First, the party to be estopped, Government, certainly "knew the facts" [9] relevant here. As

---

so act that he would suffer a loss if he were compelled to surrender or forego or alter what he has done by reason of the first party being permitted to repudiate his conduct and assert rights inconsistent with it.
See Sly v. United States, 220 F.2d 212, 214–215 (7th Cir. 1955); Smale & Robinson, *supra*, 123 F.Supp. at 463; Comment, Never Trust a Bureaucrat: Estoppel Against the Government, 42 So.Cal.L.Rev. 391 *passim* (1969). Cf. 28 Am.Jur.2d Estoppel and Waiver § 35, at 640; Bigelow, *supra*, at p. 602 *passim;* Pospishl, Equitable Estoppel, 19 Neb.L.Bull. 222, 232–235 (1940); 4 A.L.R.3d 361, Comment Note; Quantum or Degree of Evidence Necessary to Prove an Equitable Estoppel (1965); Comment, 12 Ore.L. Rev. 316 (1933). See also Comment, Equitable Estoppel and the Statute of Frauds in California, 53 Cal.L.Rev. 590 (1965); Comment, Equitable Estoppel—Actual or Constructive Knowledge by the Person Estopped, 26 Neb.L.Rev. 461 (1947).

5. The "fraud" often said to be required in order to find an equitable estoppel is really only unconscientious or inequitable behavior. 3 Pomeroy § 803, at 185–186.

6. *Id.* § 808a. As Pomeroy noted, *id.* § 818, at 250: "Acquiescence consisting of mere silence may also operate as a true estoppel in equity to preclude a party from asserting legal title and rights of prop-

erty, real or personal, or rights of contract."

7. It is long-settled that an equitable estoppel may be invoked even where land or title thereto is involved. Kirk v. Hamilton, 102 U.S. 68, 76–78, 26 L.Ed. 79 (1880); Godeffroy v. Caldwell, 2 Cal. 489, 492 (1852).

8. Compare the general statement of this principle in 28 Am.Jur.2d Estoppel and Waiver § 112, at 769:
 "As some of the authorities broadly state the principle, one who knowingly and silently permits another to expend money on land under a belief that he has the right or title will not be permitted to set up his own right, to the exclusion of the rights of the one who made such improvements."

9. The Government, like a private corporation, acquires knowledge through its agents. Under well-established principles of agency, a principal is bound by the knowledge of its agent concerning a matter upon which it is the agent's duty to give the principal information. Restatement, Agency 2d § 272. It is no defense that the agent did not, in fact, communicate his knowledge to his principal. Bowen v. Mt. Vernon Savings Bank, 70 App. D.C. 273, 105 F.2d 796 (1939). United States v. Hanna Nickel Smelting Company, 253 F.Supp. 784, 793 (D.C.Ore. 1966) aff'd, 400 F.2d 944 (9th Cir. 1968).

found by the district court below, the 1934 Document was a binding agreement signed by both Georgia-Pacific and a representative of the Government, the Regional Forester. The evidence also makes it clear that Congress was aware of this agreement and knowingly "ratified" it by the passage of the Act of June 13, 1935. (See footnote 1, *supra*). Government also knew the facts when another of its representatives, Assistant Secretary of the Interior Sherman, issued P.L.O. 1600, *supra*, pursuant to a delegation of authority from the President, to effect the retraction of the Siskiyou National Forest northern boundary. Government knew the facts when, by Act of Congress in August, 1958,[10] the exterior boundaries of the Siskiyou National Forest along the Rogue River to the South of the Eden Ridge Tract were extended, but the northern boundary as reduced by P.L.O. 1600 was not disturbed. Finally, Government knew the facts when it permitted Lumber Company and its successor, Georgia-Pacific, to manage and develop the Eden Ridge Tract until 1958 without making any formal demands for conveyance of cutover lands and when, after P.L.O. 1600 was issued in 1958, the personnel of both Government and the Forest Service treated the boundaries of Siskiyou National Forest as though they had in fact been retracted to the pre-1934 status. Government can hardly claim that it was not aware of the expenditures made by Georgia-Pacific on the lands it thought it owned in the period between 1958 and the Government's bringing suit in 1967.

Second, whether or not Government and its representatives "intended" that Georgia-Pacific act in reliance on Government's actions (and inactions), it is beyond dispute that Georgia-Pacific had a reasonable right to act in reliance thereon. All of Government's actions during the period 1934–1958 were consistent with the belief that Government was not pressing any claims it had under the 1934 Document other than to accept cutover lands as Lumber Company and its successors might convey them. And all of Government's actions during the period 1958–1967 were consistent with Georgia-Pacific's belief that P.L.O. 1600 had in fact reduced the boundaries of Siskiyou National Forest to their status existing prior to the execution of the 1934 Document.

Third, Georgia-Pacific was "ignorant of the true facts", if, as Government claims, the "true facts" are that it never relinquished any claims it had under the 1934 Document and that P.L.O. 1600 was ineffective to cut off Government's rights because its issuance was not validly authorized. There was no explicit statute, ruling, order or case authority to give Georgia-Pacific any indication whatsoever that P.L.O. 1600 might have been issued pursuant to an improper delegation of authority, assuming for the moment such to be the case. Government and its representatives, as discussed above, even treated the Order as binding, changing the pertinent maps and Forest Service routines to coincide with the changes decreed by the Order.

Fourth and finally, it is true that Georgia-Pacific did rely on the representations (or lack of same in some instances) to its injury. Georgia-Pacific spent some $350,000, beginning in 1956, in an intensive forest management program. Georgia-Pacific has maintained a 300-mile road system and has reseeded or planted a new crop of trees. In addition, Georgia-Pacific has continued to pay its annual ad valorem taxes to Coos and Douglas Counties and to pay its annual dues for fire protection to the Fire Patrol Association.

The major issue facing this Court is not whether the facts are sufficient to raise the defense of equitable estoppel, but whether under the circumstances such estoppel can be raised against Government. It has been held generally that the Government is not subject to the same rules of property and estoppel as

10. 72 Stat. 987.

are private suitors. See United States v. California, 332 U.S. 19, 40, 40 n. 22, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947); Shotwell v. United States, 163 F.Supp. 907, 915 (E.D.Wash.1958).[11] Such governmental immunity from estoppel is an off-shoot of sovereign immunity.[12] Both the doctrine of sovereign immunity and that of governmental immunity from estoppel have been much discussed, criticized and limited in recent years.[13] While the resulting disfavor with sovereign immunity has resulted in legislation limiting the availability of that defense in certain actions against the Government,[14] a corresponding expansion

11. But see United States v. Denver & R. G. W. R. Co., 16 F.2d 374 (8th Cir. 1926); United States v. Stinson, 125 F. 907, 910, 60 C.C.A. 615 (7th Cir. 1903) aff'd, 197 U.S. 200, 25 S.Ct. 426, 49 L.Ed. 724 (1905).

 This is also true to varying degrees in proceedings against state governments and their subdivisions. At least one state, Louisiana, permits estoppels to be asserted against its political bodies to the same degree that they would be available against private parties. Prebensen & Blakstad v. Board of Commissioners, 241 F.Supp. 757, 760–761 (E.D.La.1965). See Comment, Never Trust a Bureaucrat: Estoppel Against the Government, 42 So. Cal.L.Rev. 391, 396 (1969).

12. Davis, Administrative Law Treatise § 17.01, at 493 (1958); Berger, Estoppel Against the Government, 21 U.Chi.L.Rev. 680, 683 (1954); Pillsbury, Estoppel Against the Government, 13 Bus.Law 508, 510 (1958). Yet Street tells us that there is no trace of a decision holding that the King is not bound by equitable estoppel. Street, Governmental Liability 157 (Cambridge 1953). As one English court said in Robertson v. Minister of Pensions, 1 K.B. 227, 231 (1949) "The Crown cannot escape by saying that estoppels do not bind the Crown, for that doctrine has long been exploded."

13. Sovereign immunity has been on the decline at both the state and federal level. One commentator has called sovereign immunity "[p]erhaps the most anachronistic doctrine in Anglo-American public law. * * *" Schwartz, Estoppel and Crown Privilege in English Administrative Law, 55 Mich.L.Rev. 27 (1956). See Mr. Justice Frankfurter's dissent in Great Northern Life Ins. Co. v. Read, 322 U.S. 47, 49, 64 S.Ct. 873, 88 L.Ed. 1121 (1944). Congress has passed several acts granting claimants rights against the Government which theretofore had been denied them under the doctrine of sovereign immunity. Notable have been the Tucker Act, Act of March 31, 1887, c. 359, 24 Stat. 505 (codified in 28 U.S.C.); the Federal Tort Claims Act of 1946, 28 U.S.C. §§ 2671–2680 (1952); and the Portal-to-Portal Act of 1947, 61 Stat. 89 (1947), 29 U.S.C. § 259 (1955 Supp.). For similar legislation see Comment, Estoppel Against the Government in California, 44 Cal.L.Rev. 340, 341 n. 7 (1956).

 Numerous articles have criticized the unavailability, or limited availability, of estoppel as a defense against the Government. E. g., Davis, Administrative Law Treatise §§ 17.01–17.09 (1958); Berger, supra at n. 12, Pillsbury, supra, at n. 12; Newman, Should Official Advice Be Reliable?—Proposals as to Estoppel and Related Doctrines in Administrative Law, 53 Colum.L.Rev. 374 (1953); Schwartz, supra; Whelan and Dunigan, Comment: Government Contracts: Apparent Authority and Estoppel, 55 Geo.L.J. 830 (1967); Comment, 42 So.Cal.L.Rev., supra; Note, The Proper Case for Estoppel Against Federal Administrative Agencies, 28 Notre Dame Law 234 (1953); Comment, 16 Geo.Wash.L.Rev. 273 (1948).

 Other articles dealing with the problem of equitable estoppel against the Government or other political bodies include: Gordon, Finality of Immigration and Nationalization Determinations—Can the Government Be Estopped?, 31 U.Chi.L. Rev. 433 (1964); Jones, Estoppel in Tax Litigation, 26 Geo.L.J. 868 (1938); Kenney, Availability of the Equitable Defense of Estoppel Against the Government in Federal Taxation Law, 3 U.Det.L.Rev. 123 (1940): McIntyre, Authority of Government Contracting Officers: Estoppel and Apparent Authority, 25 Geo.Wash.L. Rev. 162 (1956); De Y. Manning, The Application of the Doctrine of Estoppel Against the Government in Federal Tax Cases, 30 N.C.L.Rev. 356 (1952); Wagner, Estoppel by Informal Administrative Action or Opinion in Sales and Use Tax Cases, 64 Dick.L.Rev. 47 (1959).

14. See *supra* n. 12. Davis notes that "[b]ecause of the erosion of the doctrine of sovereign immunity the cases estopping the government may largely represent the law of the future, even though they are still exceptional." Davis, § 17.03 at 504. Typical of the modern trend is a recent proposal made at the third plenary session

of the availability of estoppel against the Government has occurred rather more slowly.

In the leading case expressing the limitations of equitable estoppel against the Government, Utah Power & Light Co. v. United States, 243 U.S. 389, 409, 37 S.Ct. 387, 391, 61 L.Ed. 791 (1916), the United States Supreme Court said:

> "[T]he United States is neither bound nor estopped by acts of its officers or agents in entering into an arrangement or agreement to do or cause to be done what the law does not sanction or permit.
>
> \* \* \* \* \* \*
>
> A suit by the United States to enforce and maintain its policy respecting lands which it holds in trust for all the people stands upon a different plane in this and some other respects from the ordinary private suit to regain the title to real property or to remove a cloud from it." [15]

In Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10, 175 A.L.R. 1075 (1947), the Supreme Court declined to find the Federal Crop Insurance Corporation estopped to deny liability on a policy for wheat protection issued to Merrill. Provisions restricting the coverage of certain kinds of wheat having been published in the Federal Register, Merrill was found to have been on constructive notice thereof to the extent that insurance could not be issued to protect his type of crop.[16]

The growth of government and the concomitant increase in its functions, power and contacts with private parties has made many courts increasingly reluctant to deny the defense of equitable estoppel in appropriate situations. The Government, in its caretaker role for all the public, should not be bound by the unauthorized or unlawful acts of its representatives. On the other hand, it is hardly in the public's interest for the Government to deal dishonestly or in an unconscientious manner. This is especially imperative in a time when few individuals and corporations, if any, can escape numerous dealings with the Government and its agents.

Numerous cases reflect the position that equitable estoppels may be found against the Government in certain situations. Thus the courts have held that an equitable estoppel may be found against the Government (1) if the Government is acting in its proprietary rather than sovereign capacity;[17] and (2) if its rep-

of the Administrative Conference of the United States. It was there proposed that the federal defense of sovereign immunity be abolished in federal court actions seeking relief other than money damages and stating a claim challenging official action or non-action. In support of the proposal, Professor Davis noted that adoption of the proposal "[w]ould follow a discernible movement away from sovereign immunity as expressed by Congress in its strengthening of the Court of Claims Act and the Federal Tort Claims Act." 38 U.S.L.Week 2242 (Oct. 28, 1969).

15. See also Beaver v. United States, 350 F.2d 4, 8 (9th Cir. 1965); City and County of San Francisco v. United States, 223 F.2d 737, 739 (9th Cir. 1955).

16. There has been considerable discussion and criticism of the Merrill case; see Mr. Justice Jackson's dissent thereto, 332 U.S. 387–388, 68 S.Ct. 1, and comments in 2 Davis, supra, n. 12; Pillsbury, supra, at 51–513; Schwartz, supra, at 30 passim; Whelan and Dunigan, supra, at 848.

17. Hatchitt v. United States, 158 F.2d 754, 757 (9th Cir. 1946); Woodbury v. United States, 232 F.Supp. 49, 58 (D.Or.1964) aff'd and rev'd, 359 F.2d 370 (9th Cir. 1966); United States v. County of Lawrence, 173 F.Supp. 307, 314 (W.D.Pa. 1959) rev'd o. g., 280 F.2d 462 (3d Cir. 1960) aff'd, 364 U.S. 628, 81 S.Ct. 357, 5 L.Ed.2d 363 (1961); Davis, op. cit., supra, at 493; 28 Am.Jur.2d, § 132, at 801, 31 C.J.S. Estoppel § 140, at p. 691.

The distinction between proprietary (private) and sovereign (governmental) functions is not often an easy or meaningful one to make. See Comment, Estoppel Against State, County, and City, 23 Wash.L.Rev. 51, 53 (1948).

resentative has been acting within the scope of his authority.[18]

(1) While it is said that the Government can be estopped in its proprietary role, but not in its sovereign role, the authorities are not clear about just what activities are encompassed by each. In its proprietary role, the Government is acting as a private concern would; in its sovereign role, the Government is carrying out its unique governmental functions for the benefit of the whole public.

In the instant case, the Government is suing to enforce a contract between it and a third party, and is thus acting as a private party would. The question here is not that of preserving public lands—since Government never had title to the cutover lands it is now claiming—but only of enforcing a private contract to gain new title to lands.

In United States v. A. Bentley & Sons Co., 293 F. 229, 235 (S.D.Ohio 1923), a case dealing with commercial paper, the court noted that

> "When the government enters into a contract with an individual or corporation, it divests itself of its sovereign character as to that particular transaction and takes that of an ordinary citizen and submits to the same law as governs individuals under like circumstances." [19]

(2) We must also ask whether Assistant Secretary of the Interior Sherman, in issuing P.L.O. 1600 in 1958, was acting beyond the scope of his authority, thus rendering such Order ineffective to bind the Government under the principles discussed above. And if it is found that such Order was ineffective when issued, was it nonetheless ratified and thus binding by the action of Congress in passing the Act of August, 1958?

Government contends that P.L.O. 1600 was never valid to affect its rights because the officer who issued it, Assistant Secretary of the Interior Sherman, was without lawful authority to do so. Although Sherman issued the Order pursuant to a valid delegation of authority within the Executive branch, the question is whether by so doing he was usurping a function reserved to Congress.[20]

An examination of the relevant statutes leads us to the conclusion that nothing forbade the executive issuance of P.L.O. 1600.

By Congressional Act of 1891[21] the President was empowered to set apart and reserve public lands as national forests and to establish such forests and their "limits" or exterior boundaries by "public proclamation." By Congressional Act of 1897[22] the President was authorized to modify past or future executive orders establishing national forests, "and by such modification may reduce the area or change the boundary lines * * * or may vacate altogether any order creating such reserve." This cor-

---

18. United States v. Fox Lake State Bank, 225 F.Supp. 723, 724 (N.D.Ill.1963) aff'd and rev'd, 366 F.2d 962 (7th Cir. 1966) ; Shotwell v. United States, supra, 163 F. Supp. at 915; United States v. Standard Oil Company of California, 20 F.Supp. 427, 452 (S.D.Cal.1937) ; Smale & Robinson, Inc. v. United States, supra, 1232 Supp. at 465.

19. Accord: McQuagge v. United States, 197 F.Supp. 460, 469 (W.D.La.1961) wherein the court said :
"In ordinary contractual relations with its citizens, the government enjoys the same privileges and assumes the same liabilities as does its citizens. This is distinguished from the situation where the sovereign is seeking to enforce a public right or protect a public interest, for example, eminent domain or an exercise of the taxing power. * * When the government enters the market place, however, and puts itself in the position of one of its citizens seeking to enforce a contractual right (i. e., one arising from express consent rather than sovereignty), it submits to the same rules which govern legal relations among its subjects."

20. Cf. Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 585, 72 S.Ct. 863, 96 L.Ed. 1153, 26 A.L.R.2d 1378 (1952).

21. 26 Stat. 1103, codified in 16 U.S.C.A. § 471.

22. 30 Stat. 34, 36, 16 U.S.CA. § 473.

ollary power in the 1897 Act was spelled out "to remove any doubt which may exist pertaining to the authority of the President thereunto." [23]

The Siskiyou National Forest was such a forest established by executive order on October 5, 1906.[24] Thereafter, by a rider to a general appropriation bill in 1907, Congress limited the President's power to create new national forests in certain western states and to extend the boundaries of national forests in such states. Similar riders were enacted in subsequent appropriation bills during the period 1907–1912, and this legislation provides:

"No national forest *shall be created, nor shall any additions be made* to one created prior to June 25, 1910, within the limits of the States of California, Oregon, Washington, Idaho, Montana, Colorado, or Wyoming, *except by Act of Congress.*" (Emphasis added) (30 Stat. 34, 36, 16 U.S.C.A. § 471 (1897)[25]

Thus the 1907–1912 Acts limited Presidential power to *extend* and *create* national forests in western states but did not purport to affect his power to *reduce* such boundaries as conferred under the 1897 Act. The limitations in the 1907–1912 Acts were express; limitations on *reduction* of boundaries were neither expressed, implied nor intended.[26]

■■■ By reading all the pertinent Congressional legislation together insofar as it lays out a general system of land laws,[27] we find no indication that we should depart from the principle of statutory construction by which repeal by implication is not favored. Wherever possible, effect should be given to both earlier and later statutes; repeal can only be implied when the new statute(s) is clearly repugnant, in words or purpose, to the old statute(s). There can be no repeal unless the intention of the legislative body to repeal is clear. United States v. Borden Co., 308 U.S. 188, 198–199, 60 S.Ct. 182, 84 L.Ed. 181 (1939).

Following the 1907–1912 Acts, presidential proclamations *reducing* national forests in the western states continued as before. On May 4, 1914, for example, the President by Proclamation pursuant to the 1897 Act changed the boundaries of Siskiyou National Forest to *exclude and eliminate* certain areas from that forest and restored the excluded public lands "to settlement in advance of entry." (38 Stat. 1994).

We find that it does not lie with the Forest Service to argue now against the validity of an administrative power which apparently has been exercised by the President or his representative without being questioned for over 50 years.

In any event, even assuming *arguendo* that P.L.O. 1600 was invalid for lack of authority in the President to issue it, we are faced with subsequent Congressional action which in effect confirmed the April, 1958, boundary change.

In August, 1958, Congress, with knowledge of the previous boundary reduction,[28] extended the boundaries of

---

23. 30 Stat. 34, 36; prefatory statement quoted in historical note to 16 U.S.C.A. § 473.

24. 26 Stat. 1103, codified in 16 U.S.C.A. § 471.

25. Similar legislation has been enacted with respect to New Mexico and Arizona (44 Stat. 745, 16 U.S.C.A. § 471a (1926)). The Presidential power to extend and create national forests has been substantially restored as to Montana (53 Stat. 1071, 16 U.S.C.A. § 471b).

26. Because of the 1907–1912 Acts, an Act of Congress was required to *extend* the boundaries of the Siskiyou National Forest in 1935.

27. Statutes in *pari materia* should be construed together, especially when public lands are involved. See West Coast Exploration Co. v. McKay, 93 U.S.App.D.C. 307, 213 F.2d 582, 597 (1954) cert. den. 347 U.S. 989, 74 S.Ct. 850, 98 L.Ed. 1123 (1954).

28. Ratification by Congressional action could only occur in this situation if Congress acted with full knowledge of the relevant facts. United States v. Beebe, 180 U.S. 343, 354, 21 S.Ct. 371, 45 L.Ed.

the Siskiyou National Forest,[29] without disturbing the newly retracted northern boundaries.

██ Therefore, even assuming lack of executive or administrative authority, the April, 1958, boundary reduction was confirmed and ratified by this subsequent Congressional action. See Polson Logging Co. v. United States, 160 F.2d 712, 714–715 (9th Cir. 1947); Restatement, Agency 2d §§ 82, 83.

██ Mr. Justice Holmes once wrote, "Men must turn square corners when they deal with the Government," [30] but it is clear that the Government is itself becoming more reasonable by permitting those corners to be rounded [31] when reason and logic demand that the Government be held to the same standard of rectilinear rectitude that · it demands from its citizens.[32] One commentator has summarized the law in this area by saying that, "The claim of the government to an immunity from estoppel is in fact a claim to exemption from the requirements of morals and justice." [33] We agree, and we find that the dictates of both morals and justice indicate that the Government is not entitled to immunity from equitable estoppel in this case.

*Clean Hands*

A second equitable defense here is that of clean hands, a doctrine somewhat akin to, but distinguishable from, that of estoppel.[34] Like estoppel, the doctrine

of clean hands is based on conscience and good faith. Hoehn v. Crews, 144 F.2d 665, 672 (10th Cir. 1944) aff'd, Garber v. Crews, 324 U.S. 200, 65 S.Ct. 600, 89 L.Ed. 870 (1945); 2 Pomeroy § 398. The Supreme Court defined the doctrine thus in Precision Instrument Mfg. Co. v. Automotive Co., 324 U.S. 806, 814, 65 S.Ct. 993, 997, 89 L.Ed. 1381 (1945):

"The guiding doctrine in this case is the equitable maxim that 'he who comes into equity must come with clean hands.' This maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant. That doctrine is rooted in the historical concept of court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith.

\* \* \* \* \* \*

This maxim necessarily gives wide range to the equity court's use of discretion in refusing to aid the unclean litigant."

██ The Government comes before this Court seeking the equitable remedy of specific performance, a decree for which can be denied if the plaintiff has not come into court with clean hands.[35]

---

563 (1901); Horner v. Ferron, 362 F.2d 224, 230 (9th Cir. 1966).

29. 72 Stat. 987.

30. Rock Island, A. & L. R. R. v. United States, 254 U.S. 141, 143, 41 S.Ct. 55, 56, 65 L.Ed. 188 (1920).

31. See *Pillsbury, supra*, at 514.

32. See Maguire and Zimet, Hobson's Choice and Similar Practices in Federal Taxation, 48 Harv.L.Rev. 1281, 1299 (1935). As Mr. Justice Jackson said in his dissent in Federal Crop Ins. Corp. v. Merrill, *supra*, at 387–388, 68 S.Ct. at 5: "It is very well to say that those who deal with the Government should turn square corn-

ers. But there is no reason why the square corners should constitute a one-way street."

33. Berger. *supra*, at 707.

34. 31 C.J.S. Estoppel § 59, at p. 367; 3 Pomeroy § 816.

35. Although the Government is not always to be treated like a merely private suitor, there is authority limiting this privilege when it is the Government which has *instituted* the suit, particularly when it has done so in its proprietary (rather than sovereign) capacity. In United States v. The Thekla, 266 U.S. 328, 339–340, 45 S.Ct. 112, 69 L.Ed. 313 (1924), the Supreme Court said:

Pope Mfg. Company v. Gormully, 144 U.S. 224, 236–237, 12 S.Ct. 632, 36 L.Ed. 414 (1892), Cathcart v. Robinson, 5 Pet. 264, 276, 8 L.Ed. 120 (1831). See National Fire Ins. Co. v. Thompson, 281 U.S. 331, 338, 50 S.Ct. 288, 74 L.Ed. 881 (1930).

■ If a court of equity finds the plaintiff to be guilty of unfair conduct or any inequitable advantage it may refuse him the remedy of specific performance—even though such conduct would not be sufficient for rescission of the contract sought to be enforced. Shikes v. Gabelnick, 273 Mass. 201, 173 N.E. 495, 497, 87 A.L.R. 1339 (1930).

Pomeroy, in noting the applicability of the doctrine of clean hands to the remedy of specific performance, states, (2 Pomeroy § 400, at 100):

> "A contract may be perfectly valid and binding at law; it may be of a class which brings it within the equitable jurisdiction, because the legal remedy is inadequate; but if the plaintiff's conduct in obtaining it, or in acting under it, has been unconscientious, inequitable, or characterized by bad faith, a court of equity will refuse him the remedy of a specific performance, and will leave him to his legal remedy by action for damages."

It is clear that in the present case a decree of specific performance in favor of Government will result in an inequitable advantage to it to the extent that Georgia-Pacific has made considerable investment in the Eden Ridge Tract based upon good faith reliance on both the boundary changes of 1958 and the failure of Government to assert any claim to the subject lands until the present suit was instituted.

■ The Government's actions can hardly be described as comporting with the dictates of good faith, fair dealing or conscience. Georgia-Pacific was given no indication that the boundary changes effected in 1958 were invalidly made (as Government claims) or that Government would later repudiate such changes to the considerable financial detriment of Georgia-Pacific. It is just these considerations which find Government's hands tainted and thus lead this court to deny its claim for specific performance.

*Other Equitable Considerations in Granting Specific Performance*

■ Our final consideration relates to the general rules of equity surrounding the discretionary remedy of specific performance. Because addressed to the discretion of the court, the remedy may be denied where the equities are such as to convince the court that justice and good conscience requires denial.[36] As this court said over half a century ago in Marks v. Gates, 154 F. 481, 482, 83 C.C.A. 321 (9th Cir. 1907):

> "The enforcement of a contract by a decree for its specific performance rests in the sound discretion of the court—a judicial discretion to be exercised in accordance with established principles of equity. A contract may be valid in law and not subject to cancellation in equity, and yet the terms thereof, the attendant circumstances, and in some cases the subsequent events, may be such as to require the court to deny its specific performance."

Courts of equity have long refused to decree specific performance where the result would be unconscionable, unjust, inequitable, oppressive or unduly harsh. See Union Pacific R'y Co. v. Chicago Etc. R'y Co., 163 U.S. 564, 603–604, 16 S.Ct. 1173, 41 L.Ed. 265 (1896); Restatement, Contracts § 367 (1932); 2 Pomeroy, § 400, at 101; 4 Pomeroy § 1405a, at 1043; 49 Am.Jur. Specific Performance § 6, at 10; § 58, at 73; 81 C.J.S. Specific Performance § 1, at pp.

"When the United States comes into court to assert a claim it so far takes the position of a private suitor as to agree by implication that justice may be done with regard to the subject matter."

See 1 A.L.R.2d 338, 340–341; Comment, 16 Geo.Wash.L.Rev. 273, 274 (1948).

36. See Note, 11 Neb.L.Bull. 319 (1933).

408–409; Note, Hardship as a Defense to Specific Performance in West Virginia, 44 W.Va.L.Q. 387 (1938). Therefore "[i]t necessarily follows that a *less strong case* is sufficient to *defeat* a suit for specific performance than is requisite to obtain the remedy." 4 Pomeroy § 1405a, at 1044.

In the instant case, a decree of specific performance would inure to the obvious and substantial hardship of Georgia-Pacific. Georgia-Pacific's program of re-seeding and planting would be rendered futile, and its expenditures on the subject land and appurtenant roads and facilities would be lost. A decree of specific performance would result in a severe diminution of the forest reserve assets of Georgia-Pacific, and Georgia-Pacific would have lost any chances it had to purchase similar timberland in the past ten years.

We find it unnecessary to consider the applicability of the doctrine of frustration of contract and of failure of consideration in relation to the 1934 Document briefed and argued by the parties in view of the grounds of our decision.

The judgment of the District Court is affirmed.