UNITED STATES of America, Plaintiff,

v.

**3.6 ACRES OF LAND, more or less, situated in the County of Spokane, State of Washington, Pring Corporation, a Washington Corporation, John Tonati and Julie Tonani, husband and wife, et al., Defendant.**

No. CS–03–0473–EFS.

United States District Court, E.D. Washington.

Sept. 13, 2004.

Pamela Jean Derusha, US Attorney's Office, Spokane, WA, for Plaintiff.

Michael James Hines, Michael A. Roozekrans, Ryan M. Beaudoin, Stanley Martin Schwartz, Timothy Michael Lawlor, Witherspoon Kelley Davenport & Toole,

James P. Emacio, Spokane, WA, for Defendant.

**ORDER DENYING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND MOTION FOR RULE 56(F) CONTINUANCE AND GRANTING THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

SHEA, District Judge.

A telephonic hearing was held in the above-captioned matter on September 8, 2004. Before the Court were Defendants' Motion for Summary Judgment, (Ct. Rec.20), and Motion for Rule 56(f) Continuance, (Ct.Rec.40), and United States of America's Cross Motion for Summary Judgment, (Ct.Rec.30). Plaintiff United States of America was represented by Pamela Jean DeRusha. Defendants Pring Corporation and the Tonanis were represented by Michael Hines and Michael Roozekrans. Ryan Beaudoin appeared on behalf of Defendant Crown Castle. After hearing oral argument and reading the submitted materials and relevant case law and statutes, the Court is fully informed. The Court grants the United States' motion and denies the Defendants' motions.

## I. Cross Motions for Summary Judgment

Defendants Pring Corporation and John and Juluee Tonani (hereinafter "Defendants") seek an order establishing that the Plaintiff United States' action on land used by the Defendants as a Recreational Vehicle Park ("R.V.Park") constitutes a taking, obligating the United States to pay the Defendants just compensation on the grounds that (1) the United States' filing of the Declaration of Taking pursuant to the Declaration of Taking Act constitutes a taking as a matter of law, (2) depriving the Defendants of the use of their property constitutes a Fifth Amendment taking, and

(3) the United States should be estopped from asserting that the elimination of the R.V. Park is not a taking that must be compensated. In turn, the United States seeks an order that the easement rights taken by virtue of the Declaration of Taking do not exceed the rights reserved by the United States in its previously acquired easement, that the United States did not deprive Defendants of a compensable property interest, and that no compensation is due to the Defendants.

In response to the United States' motion, the Defendants seek a Rule 56(f) continuance, if the Court finds that the Land Use Agreement did not restrict the United States from closing the R.V. Park, in order to conduct discovery on whether the R.V. Park interferes with the 500–kV lines.

## A. Facts

The Defendants purchased the 3.6 acre parcel at issue in 1992, as part of an approximate 6 acre parcel, from the Paynes, who had previously purchased it from the United States. (Defendants' Statement of Facts ¶ 1.) During the United States–Paynes transaction, the United States reserved a perpetual easement to the United States and the Bonneville Power Administration ("BPA") over 3.6 acres (hereinafter "the Property"): "[e]asement in favor of United States of America, the Bonneville Power Administration and its assigns ...." The Defendants purchased the 6 acre parcel through a Quitclaim Deed. The Quitclaim Deed stated, "RESERVING TO the United States of America, the Bonneville Power Administration, and its assigns, a perpetual easement and right-of-way for electric power transmis-

sion purposes in, upon, over, and under that portion of the above described tract ...." In March 1994, a Correction Deed was filed in regards to the Deed between the United States and the Paynes to include a standard clause, which was inadvertently left out of the deed, explaining the electrical transmission line right-of way:

... This reservation includes the right to enter and to locate, construct, operate, maintain, repair, rebuild, upgrade, remove, and patrol one or more lines of poles or structures and appurtenances thereto, supporting conductors of one or more electric circuits of any voltage together with the present and future right to clear the right-of-way and to keep the same clear of all structures, trees, brush, vegetation, and fire hazards, provided, however, that vegetation and fire hazards shall not include agricultural crops.

In 1994, the Defendants became interested in constructing and operating an R.V. Park on the 3.6 acres.[1] In addition, the Defendants intended to construct and operate/rent a gas station, convenience store, laundromat, car wash, retail stores, and a mini storage facility on the remaining part of the six acres. (Defendants' Statement of Facts ¶ 6.) The Defendants contacted BPA to clarify what BPA's easement included. *Id.*

A Land Use Agreement ("LUA") was ultimately reached by BPA and the Defendants. The LUA describes the "Subject" of the LUA as: "Use of Bonneville Power Administration (BPA) Easement Area for Paved Parking, Driveway, Grassy Stormwater Drainage Catchment, Landscaping, and Overnight Motor Home/Travel Trailer

---

1. At the beginning of the discussion, the Defendants notified BPA that they were interested in constructing parking and roads on the easement. However, no Land Use Agreement was entered into at this point An agreement was only entered after BPA had been notified that the Defendants planned on building and operating an R.V. Park on the easement.

Parking, Located in a Portion of the NE . . . ." The LUA then goes on to discuss that controversy exists over whether exposure to electric and magnetic fields is a health hazard, but notes that BPA cannot infringe on the land owner's rights. The LUA specifically states,

> *We do not recommend overnight motor home/trailer parking within the BPA easement area. People should not be living in these recreational vehicles on the transmission line right-of-way.*

> . . . . .

> We have determined that the above-described use of this easement will not presently be an interference with BPA's land rights as long as the following conditions are met.

LUA p. 1 (emphasis in original). The conditions include the following:

> 17. *Future Construction:* You should be aware that in the future BPA will likely construct an additional transmission line, or lines, within the currently vacant portion of this right-of-way. Also, BPA may upgrade or reconstruct the existing transmission lines to higher voltages. If one or both of these occur, your use of the right-of-way could be further restricted and/or temporarily halted. In addition, any increase in cost of design, materials, and construction, incurred by BPA as a result of your facilities being in the right-of-way, shall be charged against and be paid by you.

> 18. *Additional Uses of Right-of-Way Not on Application:* You shall not make any additions to the uses within the right-of-way as listed on your application . . .

> . . . . .

> If your use of BPA's easement area should at any time become an interference with BPA's land rights, or a hazard

to the presently installed electrical facilities of BPA, or any facilities added or constructed in the future or should such use interfere with the inspection, maintenance or repair of the same, or with the access along such easement, you will be required to remove such interference at no expense to BPA.

LUA p. 4.

The cover letter accompanying the LUA stated, that the LUA:

> includes the terms and conditions to be complied with to assure that your facilities will not interfere with operation and maintenance of BPA's existing and future transmission facilities across your property.

> . . . . .

> We do not recommend people living in motor homes and trailers while they are parked on the right-of-way. The original plan also did not anticipate parking along the southerly vacant portion of the right-of-way because of the strong possibility that an additional transmission line will be constructed in this location in the future. The location of the new double circuit 500–kV Grand Coulee–Bell line has now been determined. It will replace the southerlymost 115–kV wood pole line, with a separation of 75 feet from the remaining (northerly) wood pole line. The proposed overnight parking for travel trailers and motor homes will almost certainly be incompatible with this new line. Since the line has not yet been sagged, we do not know the structure locations, conductor (wire) clearances, phasing data, etc, and are unable to analyze the electric fields. It is likely that a tower will be sited in the area just east of the highway. If so, several RV stalls will be eliminated, and the water system will need to be relocated. If no tower is sited in this area, the

conductors will be lower, with a greater chance of unacceptable electric field levels. In any case, if construction proceeds you would be required to pay BPA for any increase in the cost of design, materials, and construction, as a result of your facilities being in the right-of-way, or you would be required to remove your interfering facilities at your expense.

08/18/94 Cover Letter pp. 1–2.

Sometime between December 2002 to March 2003, BPA informed the Defendants of its plans to upgrade and install new 500–kV transmission lines on the easement. (Defendants' Statement of Facts ¶ 19.) On April 4, 2003, BPA informed the Defendants that it was rescinding any right of the Defendants to use the easement area as an R.V. Park. (Defendants' Statement of Facts ¶ 20.) The United States filed a Declaration of Taking, pursuant to 40 U.S.C. §§ 3113 and 3114, on December 10, 2003, regarding the Property. The Declaration of Taking describes the "estate acquired" as:

A perpetual easement and right-of-way for electrical power transmission purposes in, upon, over, and under Tract GC–S–351, as hereinafter described in Schedule B and as shown in Schedule C. The easement shall include the right to enter and to locate, construct, operate, maintain, repair, rebuild, upgrade, remove and patrol one or more lines of poles or structures and appurtenances thereto, supporting conductors of one or more electric circuits of any voltage, together with the present and future right to clear the right-of-way and to keep the same clear of all trees, whether natural or cultivated, and all structures, brush, vegetation and fire hazards, provided, however, that vegetation and fire hazards shall not include agricultural crops. *The above rights include the right to clear the right-of-way and to keep the same clear of all recreational vehicles, motor homes, fifth-wheels or trailers of any type whether vacant or occupied.*

(Ct. Rec. 2 (emphasis added).) Since this filing, the United States has taken possession of the Property, and BPA is constructing a new transmission line. BPA provided pamphlets to the Defendants, such as "Landowner's Guide to Use of BPA Rights-of-way" and "Living· and Working Around High–Voltage Powerlines," which discuss the general dangers of living and working around power lines.

## B. Summary Judgment Standard

A party is entitled to summary judgment where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party seeking summary judgment must show that there is an absence of disputed issues of material fact and that he is entitled to judgment as a matter of law. FED. R. CIV. PROC. 56(c). In other words, the moving party has the burden of showing that no reasonable trier of fact could find other than for the moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." *S.E.C. v. Seaboard Corp.,* 677 F.2d 1301, 1306 (9th Cir.1982). The court is to view the facts and draw inferences in the manner most favorable to the non-moving party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505; *Chaffin v. United States,* 176 F.3d 1208, 1213 (9th Cir.1999).

A burden is also on the party opposing summary judgment to provide sufficient evidence supporting his claims to establish a genuine issue of material fact for trial. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505;

*Chaffin,* 176 F.3d at 1213. "[A] mere 'scintilla' of evidence will be insufficient to defeat a properly supported motion for summary judgment; instead, the non[-]moving party must introduce some 'significant probative evidence tending to support the complaint.'" *Fazio v. City & County of San Francisco,* 125 F.3d 1328, 1331 (9th Cir.1997) (quoting *Anderson,* 477 U.S. at 249, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202).

## C. Legal Analysis

The parties agree that federal law controls the nature of the underlying action, and Washington law controls the parties' interests under the easement. *United States v. 93.970 Acres of Land,* 360 U.S. 328, 332–33, 79 S.Ct. 1193, 3 L.Ed.2d 1275 (1959); *Cortese v. United States,* 782 F.2d 845, 849 (9th Cir.1986); *Leisnoi, Inc. v. United States,* 170 F.3d 1188, 1191 (9th Cir.1999).

### 1. *Declaration of Taking*

■ The Defendants argue that the filing of the Declaration of Taking and deposit of the Government's anticipated just compensation of $1.00 with the Court constitutes a taking. The United States argues its initiation of a condemnation act does not constitute a waiver of its previously-acquired easement rights.

Section 3113 of Title 40 is a general condemnation statute, which states:

An officer of the Federal Government authorized to acquire real estate for the erection of a public building or for other public uses may acquire the real estate for the Government by condemnation, under judicial process, when the officer believes that it is necessary or advantageous to the Government to do so. The Attorney General, on application of the officer, shall have condemnation proceedings begun within 30 days from receipt of the application at the Department of Justice.

Section 3114 pertains specifically to declaration of taking actions. Subsection (a) provides that the Government may file a declaration of taking to acquire an easement or right of way in land. 40 U.S.C. § 3114(a). Subsection (b) specifically states, "[o]n filing the declaration of taking and depositing in the court, to the use of the persons entitled to the compensation, the amount of the estimate compensation stated in the declaration-(1) title to the estate or interest specified in the declaration *vests in the Government;* (2) the land is condemned and taken for the use of the Government; and (3) the right to just compensation for the land vests in the persons entitled to the compensation." *Id.* § 3114(b) (emphasis added). Subsection (e) provides: "An appeal or a bond or undertaking given in a proceeding does not prevent or *delay the vesting of title to land in the Government.*" (emphasis added).

In *United States v. Hayes,* 172 F.2d 677, 679 (9th Cir.1949), the Government filed a declaration of taking and deposited the anticipated amount of just compensation with the registry of the court. The Ninth Circuit stated, "upon the filing of the declaration of taking, title passes to the Government, and the District Court is powerless to dismiss the proceeding." The Tenth Circuit ruled similarly: "[t]he law is clear that in eminent domain cases the government, after filing a declaration of taking and depositing in court the estimated just compensation, cannot change its mind and divest itself of the title taken." *Chandler v. United States,* 372 F.2d 276, 278–79 (10th Cir.1967); *see also Hessel v. A. Smith & Co.,* 15 F.Supp. 953, 956 (E.D.Ill.1936). The declaration of taking statute, and the cases interpreting such, is clear that upon the filing of the declaration of taking and the deposit of the just com-

pensation as anticipated by the government with the court, the interest or title sought vests in the government at that time.

Here, the United States filed a Declaration of Takings on December 10, 2003, (Ct.Rec.2), and on December 17, 2004, the Court accepted $1.00 into the registry of the Court as the Government's anticipated just compensation. The Court finds it is clear that the easement interest sought by the United States, as described in the Declaration of Taking, vested in the United States as of December 17, 2003. Accordingly, a takings has occurred, and the Defendants are entitled to just compensation for this taking.[2]

What compensation is just depends on the value of the land, in addition to what rights the United States had in the land prior to filing of the Declaration of Takings. The Court agrees with the United States' argument that the filing of the Declaration of Takings does not invalidate the United States' previously reserved easement rights. *See United States v. 93.970 Acres of Land,* 360 U.S. 328, 79 S.Ct. 1193, 3 L.Ed.2d 1275 (1959); *United States v. 60.22 Acres of Land,* 638 F.2d 1176, 1178 (9th Cir.1980); *see Catlin v. United States,* 324 U.S. 229, 65 S.Ct. 631, 89 L.Ed. 911 (1945); *cf. United States v. 156.81 Acres of Land et al.,* 671 F.2d 336, 337–38 (9th Cir.1982). However, the critical question is whether the United States through the Declaration of Takings seeks more rights or interest than the United States had previously pursuant to the reserved easement. More specifically, the

question is whether the last line describing the "estate acquired" by the Declaration of Taking—"The above rights include the right to clear the right-of-way and to keep the same clear of all recreational vehicles, motor homes, fifth-wheels or trailers of any type whether vacant or occupied"— seeks more rights than the United States enjoyed under the reserved easement. If so, then the Defendants are entitled to just compensation for the difference in the value of the 3.6 acre parcel with the right to operate an R.V. Park as compared to without the right to operate an R.V. Park.

### 2. Scope of the Previous Easement

■ The United States argues that the Defendants' use of the easement area as a R.V. Park materially interferes with the United States' rights under the terms of the easement due to safety, operation, and maintenance issues, and thus, the Defendants' just compensation is $1.00. The Defendants argue that the parties agreed to modify the scope of the reserved easement when they entered into the Land Use Agreement ("LUA").

An easement is an interest in land and generally is created by deed. *Weyerhaeuser Co. v. Carolina Power Co.,* 127 S.E.2d 539, 541 (N.C.1962). The servient owner retains the use of an easement so long as that use does not materially interfere with the use by the holder of the easement. *Veach v. Culp,* 92 Wash.2d 570, 575, 599 P.2d 526 (1979). Instruments creating easements are construed in accordance with the intention of the parties by looking

**2.** The Defendants also argued that the United States' prohibition from utilizing the Property as an R.V. Park constitutes a taking under the Fifth Amendment because BPA had expressly recognized in the Land Use Agreement that such use was a lawful exercise of the Defendants' rights. Because the Court has held that a taking occurred pursuant to 40 U.S.C.

§ 3114, the Court need not analyze whether a takings occurred solely under the Fifth Amendment. However, the Court addresses the Defendants' concerns with the Land Use Agreement under the discussion of the scope of the reserved easement and equitable estoppel.

at the language of the instrument. *City of Seattle v. Nazarenus*, 60 Wash.2d 657, 665, 374 P.2d 1014 (1962). If the language of the instrument is unambiguous, then the court cannot look beyond it. However, if the language is ambiguous, the Court can consider the situation of the property and parties, circumstances surrounding the execution of the instruction, and the practical construction of the instrument given the parties conduct or admissions. *Id.* at 665, 374 P.2d 1014; *Sunnyside Valley Irr. Dist.*, 149 Wash.2d at 880, 73 P.3d 369. An ambiguity is held against the grantor, or against the draftor. *Nazarenus*, 60 Wash.2d at 665, 374 P.2d 1014.

In the context of electrical easements, many courts addressing the scope of an such easements have found that safety practices in the operation of high voltage transmission lines is one of the incidents to the use and enjoyment of an electrical easement. *Holding v. Ind. & Mich. Elec. Co.*, 400 N.E.2d 1154, 1158 (Ind.App.1980); *Carolina Power & Light Co. v. Bowman*, 229 N.C. 682, 51 S.E.2d 191, 197 (1949); *Hartford Elec. Light Co. v. Town of Wethersfield*, 165 Conn. 211, 332 A.2d 83, 88 (1973). Customarily, the electrical easement does not entitle the easement holder to exclusive possession, and thus the servient estate has the right to raise crops, travel across the strip, and engage in other pursuits that do not hamper the easement. *Hartford Elec. Light Co.*, 332 A.2d at 88–89. This Court agrees with these propositions.

Here, the easement language reserved a general "electrical power transmission" easement. However, the March 22, 1994, Correction Deed added specific language regarding the scope of such easement:

This reservation includes the right to enter and locate, construct, operate, maintain, repair, rebuild, upgrade, remove, and patrol one or more lines of poles or structures and appurtenances thereto, supporting conductors of one or more electric circuits of any voltage together with the present and future right to clear the right-of-way and to keep the same clear of all structures, trees, brush, vegetation, and fire hazards, provided, however that vegetation and fires hazards shall not include agricultural crops.

The easement language appears clear and unambiguous. In addition, it is largely identical to the "estate acquired" language in the Declaration of Taking, absent the last line regarding exclusion of recreational vehicles. Under such terms, the United States has the right to upgrade lines and the rights to construct and operate the 500–kV lines, and the Defendants are prohibited from engaging in any activities on such land that materially interferes with these rights.

However, the Defendants contend that the United States agreed to restrict their reserved easement rights when they entered into the subsequent LUA. The United States first counter-argument is that the LUA does not alter, amend, or revoke the United States' easement rights because the LUA is not an enforceable contract because it lacks consideration and the parties did not bargain for it. The Court disagrees. The LUA was entered into by the parties after several months of communication. The United States had engineers determine whether the Defendants' proposed construction and uses would interfere with BPA's present and anticipated future easement uses. The consideration provided by the United States was that it would not restrict the Defendants' conduct on the easement if the Defendants complied with the conditions and BPA's use did not change. The consideration provided by the Defendants was that they would comply with the specific conditions im-

posed. The LUA was signed by both parties and recorded. Clearly, the LUA was not binding on third-parties, however, the parties were bound by their agreement. *See Col. Nat'l Bank of Denver v. Bohm,* 286 F.2d 494, 496 (9th Cir.1961).

Federal law governs the interpretation of the LUA as the United States is a party to it. *See Mohave Valley Irrigation v. Norton,* 244 F.3d 1164, 1165 (9th Cir.2001). To determine whether an ambiguity exists the contract is examined in its entirety and on its face. If after reviewing the entire contract on its face, two reasonable and fair interpretations are possible, an ambiguity exists. *Babikian v. Paul Revere Life Ins. Co.,* 63 F.3d 837, 840 (9th Cir. 1995); *United States v. Seckinger,* 397 U.S. 203, 209–10, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970). An ambiguity is construed against the draftor. *Seckinger,* 397 U.S. at 210, 90 S.Ct. 880; *Kunin v. Benefit Trust Life Ins. Co.,* 910 F.2d 534, 539 (9th Cir.1990).

The Court finds that the LUA is not ambiguous. The LUA clearly warned the Defendants that if the operation of an R.V. Park materially interfered with BPA's easement that such activity could be restricted. The United States did not give the Defendants permission to operate the R.V. Park after the 500–kV lines were in place, rather the language of the LUA specifically states that the Defendants' R.V. Park is consistent with the then present 115–kV lines and warned the Defendants that their use of the 3.6 acre parcel may be further restricted if the 500–kV lines were installed.

The LUA states,

*We do not recommend overnight motor home/trailer parking within the BPA easement area. People should not be living in these recreational vehicles on the transmission line right-of-way.*

. . . . .

We have determined that the above-described use of this easement will not *presently* be an interference with BPA's land rights as long as the following conditions are met.

(emphasis added). The United States allowed the R.V. Park to operate under the 115–kV lines, although it strenuously suggested that the Defendants not do so. The Defendants contend that through the imposition of the conditions the United States agreed that the R.V. Park would not interfere with the operation of 500–kV lines, however, the LUA specifically stated that the following conditions were required to not interfere with the BPA's "present" use.

In addition, Condition No. 17 warned the Defendants:

17. *Future Construction:* You should be aware that in the future BPA will likely construct an additional transmission line, or lines, within the currently vacant portion of this right-of-way. Also, BPA may upgrade or reconstruct the existing transmission lines to higher voltages. If one or both of these occur, your use of the right-of-way could be *further restricted and/or temporarily halted.* In addition, any increase in cost of design, materials, and construction, incurred by BPA as a result of your facilities being in the right-of-way, shall be charged against and be paid by you.

The use of the phrase "further restricted and/or temporarily halted" does not, as Defendants propose, infer that BPA agreed that the R.V. Park would not interfere with the 500–kV lines operation. The Court finds that the phrase "further restricted" would have warned a reasonable person that the R.V. Park could be closed if such use was incompatible with the 500–kV lines; especially, when read in conjunc-

tion with the language that preceded the list of conditions:

> If your use of BPA's easement area should at any time become an interference with BPA's land rights, or a hazard to the presently installed electrical facilities of BPA, or any facilities added or constructed in the future or should such use interfere with the inspection, maintenance or repair of the same, or with the access along such easement, you will be required to remove such interference at no expense to BPA.[3]

For these reasons, the Court concludes that the LUA did not modify the scope of the easement. The United States agreed not to contest Defendants' actions on the easement area as long as the conditions were met and the 115–kV lines were in place. Thus, the Court must analyze whether the operation of the R.V. Park materially interferes with BPA's reserved easement.

The Defendants argue that the United States refused to specify how the R.V. Park would interfere with the new 500–kV transmission lines. In response to the motions, the United States has provided declarations from electrical professionals stating that the R.V. Park is not compatible with a 500–kV lines, after considering maintenance and repair issues, public safety concerns, and the continued integrity and reliability of its electric services. The experts concluded that the R.V.s place the integrity of the transmission system at risk, people living on the easement are at an increased risk of shock or severe damage to their person, and the presence of the R.V.s would interfere with the maintenance of the transmission lines. Defendants seek an opportunity to respond to

such findings through a Rule 56(f) continuance motion.

The Court denies the Defendants' Rule 56(f) motion as the Defendants had access to the pamphlets discussing the safety and operation concerns of such lines. The Defendants had adequate notice and in fact hired an expert to determine whether the R.V. Park and 500–kV lines were compatible.

Based on the expert reports submitted, the Court finds that it is clear that the continued operation of the R.V. Park would materially interfere with the operation of the 500–kV lines. The new steel tower is much larger than the previous towers and thus takes up more space. Thus, BPA needs additional area in which to access the tower and lines. In addition, overnight parking and living next to these higher voltage lines creates safety issues for the individuals living there and the BPA workers trying to access the lines, including nuisance shocks and the possibility for a spark to discharge and ignite gasoline vapors. Accordingly, the Court finds that the R.V. Park is not consistent with the 500–kV lines as BPA needs to maintain clear and direct access to the new steel tower and conducts for maintenance and emergency repairs.

### 3. *Estoppel*

 Defendants ask the United States be estopped from asserting that the elimination of the Defendants' use of the easement area does not constitute a taking because they consented to the fact that the R.V. Park was a lawful use and exercise of Defendants' property rights in the LUA, even knowing that it would install new

---

**3.** The cover letter accompanying the LUA contained similar language, however, the cover letter is parol evidence because it was not signed by both parties. The Court finds that

the LUA is unambiguous, thus, the Court does not look to the cover letter to determine the parties' intent.

500–kV lines. The Defendants spent substantial amounts to develop and operate the R.V. Park and commercial site based upon BPA's representations.

Equitable estoppel is a doctrine adjusting the relative rights of parties based upon consideration of justice and good conscience. *United States v. Ga.-Pac. Co.*, 421 F.2d 92, 96 (9th Cir.1970). This doctrine "prevents a party from assuming inconsistent positions to the detriment of another party." *Id.* The party seeking equitable estoppel must prove the four elements by a preponderance of the evidence: (1) the party to be estopped knew the facts, (2) the party to be estopped intended his conduct to be acted upon or must so act that the party asserting estoppel had a right to believe it was so intended, (3) the party seeking estoppel was ignorant of the true facts, and (4) the party seeking estoppel relied on the former's conduct to his injury. *Id.* Equitable estoppel can be used against the government if it engages in affirmative misconduct going beyond mere negligence and if the public's interest will not suffer undue damage. *Sulit v. Schiltgen*, 213 F.3d 449, 454 (9th Cir.2000); *Lehman v. United States*, 154 F.3d 1010, 1016–17 (9th Cir.1998).

The Court finds as a matter of law in favor of the United States. As discussed above, the Court finds that the language of the LUA was clear, warning the Defendants that their use of the 3.6 acre parcel may be restricted in the future if the 500–kV lines were installed, and thus the Defendants reliance was unreasonable.

### 4. *Conclusion*

In summary, the Court finds that under the previously reserved easement the United States has the ability to stop the operation of the R.V. Park because the R.V. Park materially interferes with the United States' electrical easement. As a result, the United States, through the Declaration of Taking, merely "took" an interest they previously had. Accordingly, the Court finds that the Government's anticipated compensation of $1.00 is just.

For the reasons given above, **IT IS HEREBY ORDERED:**

1. Defendants' Motions for Summary Judgment, (**Ct.Rec.20**), and for Rule 56(f) Continuance, (**Ct.Rec.40**), are **DENIED.**

2. United States of America's Cross Motion for Summary Judgment, (**Ct. Rec.30**), is **GRANTED.** The $1.00 deposited in the Registry of the Court is to be paid to Defendant Pring Corporation and the Tonanis (0.50 cents to each party), without interest, as the just compensation for the property "taken."

**IT IS SO ORDERED.** The District Court Executive is directed to:

(1) Enter this Order,

(2) Enter Judgment in favor of the United States, and

(3) Provide copies to counsel.